TYSON, Judge.
 

 *436
 
 Matthew Ray Hooks ("Defendant") appeals from judgment after a jury convicted him of (1) misdemeanor child abuse; (2) manufacturing methamphetamine; (3) trafficking in methamphetamine; and, (4) thirty-five counts of possession of an immediate methamphetamine precursor. We find no error in Defendant's conviction or the judgment entered thereon.
 

 I. Factual Background
 

 Defendant, his girlfriend, Brandi Moss ("Moss"), and their eight-year-old son rented a mobile home from Sue Drye ("Ms. Drye"), Moss's mother, located in Concord, Cabarrus County, North Carolina. They were evicted for non-payment of rent, and Ms. Drye wanted them to move out by 16 October 2011. Ms. Drye owned a storage shed located on the property with the mobile home. She asked Defendant to clean his belongings out of the shed, because she wanted to rent the property to someone else. Defendant became angry, and responded, "Nobody better not [sic] touch my storage building." Defendant had previously secured the shed with a lock.
 

 On 17 October 2011, Ms. Drye contacted Cabarrus County Sheriff's Department Detective Jamie Barnhardt ("Detective Barnhardt"). Ms. Drye stated "she had received information from somebody else that [Defendant and Moss] were cooking meth," and she wanted law enforcement "to come take a look" before she rented the mobile home to anyone else. Ms. Drye expressed concern that "if something [was] left behind, it would put others in danger[.]" Detective Barnhardt agreed to meet with Ms. Drye at the mobile home.
 

 Detective Barnhardt and Ms. Drye walked through the mobile home, room by room. As they were walking outside toward the storage shed and the playhouse, a neighbor alerted them that a trash can between
 
 *437
 
 the two structures was smoking. Detective Barnhardt lifted the lid of the trash can and discovered a clear bottle filled with a bubbling, white "pasty, chalky substance." Detective Barnhardt testified he immediately knew this was "part of a meth [ ] cooking operation," based on his training and experience.
 

 Detective Barnhardt notified his superiors, fire personnel, and the State Bureau of Investigation ("SBI"). The area was cordoned off as more personnel arrived and law enforcement awaited a search warrant, which provided for the immediate destruction of certain dangerous chemicals.
 

 Law enforcement cut off the lock on the storage shed. Detective Barnhardt testified when they opened the doors, there was "an immediate chemical reaction," which caused "smoke and some type of gas leak" to emanate from within. More chemical releases occurred throughout the night as law enforcement recovered various items from the shed and the trash can.
 

 Detective Barnhardt testified he saw agents remove several trash bags from the
 
 *136
 
 shed, which were filled with plastic bottles "that had tubing that was coming from the inside[.]" The bottles contained a "white, powderish-looking substance," consistent with what Detective Barnhardt had observed in the original bottle from the trash can. Law enforcement remained on the scene until all evidence was collected, tested by a chemist, and transported so it could be destroyed.
 

 Two days later, Defendant was arrested and charged with one count of manufacturing methamphetamine and one count of misdemeanor child abuse. Detective Barnhardt observed Defendant had chemical burns and staining on his hands during the fingerprinting process of Defendant's arrest. Detective Barnhardt testified this staining was consistent with the staining he had observed on the walls of the storage shed.
 

 On 31 October 2011, a grand jury indicted Defendant for manufacturing methamphetamine and misdemeanor child abuse. On 9 April 2012, a grand jury also indicted Defendant for: (1) forty counts of possession of an immediate methamphetamine precursor chemical with the intent to manufacture a controlled substance, methamphetamine; (2) maintaining a dwelling place for keeping and selling a controlled substance, methamphetamine; and (3) trafficking in methamphetamine by possession of more than 28 grams but less than 200 grams of methamphetamine.
 

 On 30 April 2012, a grand jury indicted Defendant in fourteen separate superseding indictments for: (1) maintaining a dwelling place for keeping and selling a controlled substance, methamphetamine;
 

 *438
 
 (2) trafficking in methamphetamine by possession of more than 28 grams but less than 200 grams of methamphetamine; and, (3) forty counts of possession of an immediate methamphetamine precursor chemical, pseudoephedrine, with the intent to manufacture a controlled substance, methamphetamine. Defendant's case proceeded to trial before a jury on 19 August 2014.
 

 Agent Stephanie Raysich ("Agent Raysich"), the North Carolina State Crime Lab forensic scientist who responded to the scene on 17 October 2011, testified as an expert in the investigation of clandestine manufacture of methamphetamine. Agent Carroll Pate ("Agent Pate"), a forensic scientist with the North Carolina State Crime Lab, took over the case after Agent Raysich became ill, and testified as an expert in forensic drug chemistry and the investigation of clandestine manufacture of methamphetamine.
 

 Agent Pate explained this particular case involved manufacturing methamphetamine using the "one-pot" method. Agents Pate and Raysich both testified about numerous items observed at the scene that were consistent with the clandestine manufacture of methamphetamine, including: (1) 79 HC1 (hydrochloric acid gas) generators; (2) two empty one-gallon cans of Coleman fuel; (3) two empty cans of Drano; (4) one empty thirty-two-ounce plastic bottle of charcoal lighter fluid; (5) one empty twelve-ounce plastic bottle of power steering fluid; (6) numerous pieces of plastic and rubber tubing in various sizes and colors; (7) numerous pieces of white paper strips, some of which contained metal material consistent with lithium ; (8) empty lithium battery packaging; (9) numerous pieces of burned aluminum foil containing a brown-black powder residue; (10) empty box covers of instant cold packs and empty cold pack plastic bags; (11) four partial plastic straws containing a residue amount of white crystalline material; (12) one box of heavy duty aluminum foil; (13) two empty containers of salt; (14) an empty container of instant starting fluid; (15) a full container of muriatic acid; (16) two empty cans of drain cleaner; (17) a one-milliliter syringe; and, (18) several empty pseudoephedrine boxes and blister packs. Six items were seized for testing in the laboratory, including an old methamphetamine cooking vessel and items containing various residues. The remainder of the items seized at the scene were destroyed.
 

 Agent Pate testified the total amount of pseudoephedrine present from the boxes and blister packs "would yield 18.9 grams methamphetamine at a one hundred percent theoretical yield." Agent Pate conducted a confirmatory test on a glass jar containing a blue sludge material. Agent Pate determined the material, which weighed fifty-one
 
 *137
 
 grams, contained
 
 *439
 
 either pseudoephedrine or ephedrine and an unknown amount of methamphetamine. The other items tested contained traces of methamphetamine, but not in sufficient quantities to weigh.
 

 Becca Clontz ("Ms. Clontz") bought the mobile home from Ms. Drye, and moved in approximately six weeks after Defendant and Moss moved out. She testified one day she was cleaning the water heater closet and discovered a piece of paper containing what appeared to be a recipe for methamphetamine written on it. Ms. Clontz gave the piece of paper to Ms. Drye, and Ms. Drye subsequently turned it over to law enforcement. Ms. Drye and Moss were familiar with Defendant's handwriting, and both testified the handwriting on the piece of paper was that of Defendant's.
 

 William Lanuto ("Lanuto") was a friend of Defendant and Moss. He testified he had seen Defendant "cook[ing] meth" in the storage shed. He stated he once saw a fire on Defendant's porch, which appeared to grow larger as rain fell on it. Lanuto testified he purchased pseudoephedrine for Defendant approximately twenty times, beginning in April 2011, with the understanding that Defendant was going to use the pseudoephedrine to "cook meth."
 

 Lanuto admitted to using methamphetamine with Defendant in exchange for purchasing pseudoephedrine. Lanuto stated he helped Defendant pack and move out of the mobile home during October 2011. Lanuto testified Defendant was "[m]aking meth" throughout that weekend. Lanuto was charged with eleven counts of felony possession of a precursor chemical with the intent to manufacture methamphetamine in relation to this case.
 

 Moss and Defendant no longer maintained a relationship at the time of trial. Moss stated she and Defendant engaged in a relationship for ten years, and parented a child together. Moss testified she had witnessed Defendant "cook methamphetamine" more times than she could count.
 

 Moss admitted she bought pseudoephedrine in order to make methamphetamine and assisted Defendant in the process of manufacturing methamphetamine. At the time of trial, Moss had been charged with and pled guilty to the following charges: (1) manufacturing methamphetamine; (2) trafficking in methamphetamine; (3) eleven counts of possession of a precursor chemical with intent to manufacture methamphetamine; and, (4) misdemeanor child abuse. Moss was currently serving a ten- to thirteen-year term of imprisonment.
 

 Michael Rimiller ("Mr. Rimiller"), a district loss prevention manager for Walgreens, testified about the regulations Walgreens followed with
 
 *440
 
 regard to the sales of pseudoephedrine. Mr. Rimiller stated individuals were required to produce a valid driver's license in order to purchase pseudoephedrine. Mr. Rimiller explained that during the relevant time period in 2011, Walgreens recorded and tracked pseudoephedrine purchases by reporting the purchases to the National Precursor Log Exchange ("NPLEx").
 

 The NPLEx system collects data of over-the-counter pseudoephedrine and ephedrine sales "in real time at the point of sale and also measures all those purchases against the laws that are in effect[.]" The NPLEx system is used to inform the sales clerk whether to proceed with the sale. The information from the NPLEx system is subsequently made available to law enforcement in a separate report.
 

 James Reilly ("Mr. Reilly"), director of health and wellness at Walmart, testified he was responsible for maintaining pharmacy compliance. Mr. Reilly explained Walmart maintained compliance logs of pseudoephedrine purchases in order to keep track of the daily, monthly, and annual limits of pseudoephedrine purchases. He testified Walmart also required the purchaser of pseudoephedrine to present a valid form of photo identification.
 

 SBI Special Agent William Galloway ("Agent Galloway") responded to reports of a possible "meth lab" at Defendant's former residence on 17 October 2011. Agent Galloway obtained the search warrant and was in charge of crime scene documentation. He conducted witness interviews and obtained Defendant's phone records. Agent Calloway
 
 *138
 
 requested the pseudoephedrine purchase records for the eight months prior to the discovery of Defendant's "meth lab" for certain individuals based on frequently dialed phone numbers in Defendant's call log.
 

 Agent Galloway summarized NPLEx records of pseudoephedrine purchases from Walgreens and Walmart made by Defendant, Moss, Lanuto, Aaron Tallent ("Tallent"), and Fred Cook ("Cook"). He testified: Tallent purchased pseudoephedrine six times between 9 July 2011 and 1 September 2011; Lanuto purchased pseudoephedrine seventeen times and was blocked from purchasing pseudoephedrine once between 25 June 2011 and 14 October 2011; Moss purchased pseudoephedrine twelve times between 22 March 2011 and 24 July 2011; and Defendant purchased pseudoephedrine thirty-five times and was blocked from purchasing pseudoephedrine five times between 4 May 2011 and 11 October 2011.
 

 Defendant did not exercise his right to testify at trial, nor did he offer any additional evidence. Defendant moved to dismiss the charges at the close of all of the evidence. The trial court denied Defendant's
 
 *441
 
 motion. The State dismissed the charges of maintaining a dwelling and five counts of possession of an immediate precursor chemical.
 

 The jury returned a verdict of guilty on all remaining charges. The trial court sentenced Defendant to 83 to 109 months imprisonment for his manufacturing methamphetamine conviction. The trial court also sentenced Defendant to a consecutive mandatory term of 70 to 84 months imprisonment for trafficking in methamphetamine, four consecutive terms of 19 to 23 months imprisonment for the thirty-five counts of possession of a precursor chemical, and a consecutive term of 150 days imprisonment for his misdemeanor child abuse conviction.
 

 Defendant gave notice of appeal in open court.
 

 II. Issues
 

 Defendant argues the trial court erred by (1) denying his motion to dismiss the charge of trafficking in methamphetamine due to a fatal variance between the indictment and the State's evidence at trial; and (2) denying his motion to dismiss the thirty-five counts of possession of the precursor chemical pseudoephedrine due to insufficient evidence.
 

 III. Analysis
 

 A. Fatal Variance
 

 Defendant argues the trial court erred by denying his motion to dismiss the charge of trafficking in methamphetamine and asserts a fatal variance between the indictment and the State's evidence. Defendant contends the superseding indictment alleged he "unlawfully, willfully and feloniously did possess more than 28 grams but less than 200 grams of methamphetamine[,]" but the trial court instructed the jury it could convict Defendant of trafficking in methamphetamine, if it found Defendant knowingly possessed "any mixture containing methamphetamine."
 

 1. Standard of Review
 

 "This Court reviews the trial court's denial of a motion to dismiss
 
 de novo.
 
 "
 
 State v. Smith,
 

 186 N.C.App. 57
 
 , 62,
 
 650 S.E.2d 29
 
 , 33 (2007) (citation omitted).
 

 A motion to dismiss based on insufficiency of the evidence to support a conviction must be denied if, when viewing the evidence in the light most favorable to the State, there is substantial evidence to establish each essential element of the crime charged and that defendant was the perpetrator of the crime.
 

 *442
 

 State v. Cody,
 

 135 N.C.App. 722
 
 , 727,
 
 522 S.E.2d 777
 
 , 780 (1999) (citation and internal quotation marks omitted).
 

 This Court reviews the sufficiency of an indictment
 
 de novo.
 

 State v. Marshall,
 

 188 N.C.App. 744
 
 , 748,
 
 656 S.E.2d 709
 
 , 712 (2008). "An indictment must set forth each of the essential elements of the offense.... To require dismissal any variance must be material and substantial and involve an essential element."
 
 State v. Pelham,
 

 164 N.C.App. 70
 
 , 79,
 
 595 S.E.2d 197
 
 , 203 (citations omitted),
 
 appeal dismissed and disc. review denied,
 

 359 N.C. 195
 
 ,
 
 608 S.E.2d 63
 
 (2004).
 

 *139
 

 2. Analysis
 

 "In order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context." N.C.R.App. P. 10(a)(1) ;
 
 see also
 

 State v. Maness,
 

 363 N.C. 261
 
 , 273,
 
 677 S.E.2d 796
 
 , 804 (2009),
 
 cert. denied,
 

 559 U.S. 1052
 
 ,
 
 130 S.Ct. 2349
 
 ,
 
 176 L.Ed.2d 568
 
 (2010). A defendant must state at trial a fatal variance is the basis for his motion to dismiss in order to preserve a fatal variance argument for appellate review.
 
 State v. Curry,
 

 203 N.C.App. 375
 
 , 384,
 
 692 S.E.2d 129
 
 , 137,
 
 disc. review denied,
 

 364 N.C. 437
 
 ,
 
 702 S.E.2d 496
 
 (2010).
 

 Defendant based his motion to dismiss solely on insufficiency of the evidence. Defendant did not allege the existence of a fatal variance between the indictment and the jury instructions. When the trial judge asked the parties if they had any questions regarding the proposed jury instructions, counsel for Defendant replied, "None from the defense, Your Honor."
 

 Defendant seeks for the first time on appeal to argue the trial court erred by denying his motion to dismiss due to a fatal variance between the indictment and the State's proof at trial. Defendant failed to raise or make this argument in support of his motion to dismiss at trial. Because Defendant failed to properly preserve this issue, he has waived his right to appellate review on this issue.
 
 Weil v. Herring,
 

 207 N.C. 6
 
 , 10,
 
 175 S.E. 836
 
 , 838 (1934) ("[T]he law does not permit parties to swap horses between courts in order to get a better mount" on appeal). We decline to address the issue and dismiss this issue.
 

 B. Insufficient Evidence
 

 Defendant argues the trial court erred by denying his motion to dismiss the thirty-five counts of possession of the precursor chemical pseudoephedrine. Defendant contends the State presented insufficient
 
 *443
 
 evidence to prove (1) he possessed pseudoephedrine; and (2) the chemical composition of the alleged controlled substance.
 

 1. Standard of Review
 

 "This Court reviews the trial court's denial of a motion to dismiss
 
 de novo.
 
 "
 
 Smith,
 

 186 N.C.App. at 62
 
 ,
 
 650 S.E.2d at 33
 
 (citation omitted). "When reviewing a defendant's motion to dismiss, this Court determines only whether there is substantial evidence of (1) each essential element of the offense charged and of (2) the defendant's identity as the perpetrator of the offense."
 
 State v. Fisher,
 

 228 N.C.App. 463
 
 , 470-71,
 
 745 S.E.2d 894
 
 , 900-01 (citations and internal quotation marks omitted),
 
 disc. review denied,
 

 367 N.C. 274
 
 ,
 
 752 S.E.2d 470
 
 (2013).
 

 In reviewing challenges to the sufficiency of evidence, we must view the evidence in the light most favorable to the State, giving the State the benefit of all reasonable inferences. Contradictions and discrepancies do not warrant dismissal of the case but are for the jury to resolve. The test for sufficiency of the evidence is the same whether the evidence is direct or circumstantial or both. Circumstantial evidence may withstand a motion to dismiss and support a conviction even when the evidence does not rule out every hypothesis of innocence.
 

 State v. Fritsch,
 

 351 N.C. 373
 
 , 378-79,
 
 526 S.E.2d 451
 
 , 455 (citations and internal quotation marks omitted),
 
 cert. denied,
 

 531 U.S. 890
 
 ,
 
 121 S.Ct. 213
 
 ,
 
 148 L.Ed.2d 150
 
 (2000).
 

 "If there is any evidence tending to prove guilt or which reasonably leads to this conclusion as a fairly logical and legitimate deduction, it is for the jury to say whether it is convinced beyond a reasonable doubt of defendant's guilt."
 
 State v. Franklin,
 

 327 N.C. 162
 
 , 171-72,
 
 393 S.E.2d 781
 
 , 787 (1990) (citation omitted).
 

 2. Analysis
 

 (a) Insufficient Evidence of Possession of a Precursor Chemical
 

 Defendant argues the State presented insufficient evidence to prove he had actual or constructive possession of products containing pseudoephedrine, a precursor chemical to methamphetamine. We disagree.
 

 *140
 
 N.C. Gen.Stat. § 90-95(d1)(2) makes it unlawful for any person to "[p]ossess an immediate precursor chemical with intent to manufacture methamphetamine[.]" N.C. Gen.Stat. § 90-95(d1)(2)(a) (2013). "To prove
 
 *444
 
 that a defendant possessed contraband materials, the State must prove beyond a reasonable doubt that the defendant had either actual or constructive possession of the materials."
 
 State v. Loftis,
 

 185 N.C.App. 190
 
 , 197,
 
 649 S.E.2d 1
 
 , 6 (2007) (citation omitted).
 

 A person has actual possession of a substance if it is on his person, he is aware of its presence, and either by himself or together with others he has the power and intent to control its disposition or use. Constructive possession, on the other hand, exists when the defendant, while not having actual possession, has the intent and capability to maintain control and dominion over the [substance]. When the defendant does not have exclusive possession of the location where the drugs were found, the State must make a showing of other incriminating circumstances in order to establish constructive possession.
 

 State v. Boyd,
 

 177 N.C.App. 165
 
 , 175,
 
 628 S.E.2d 796
 
 , 805 (2006) (citations and internal quotation marks omitted). "Constructive possession depends on the totality of the circumstances in each case. No single factor controls, but ordinarily the question will be for the jury."
 
 State v. Sinclair,
 

 191 N.C.App. 485
 
 , 492,
 
 663 S.E.2d 866
 
 , 872 (2008) (citation and internal quotation marks omitted).
 

 Defendant argues the State's evidence was insufficient to prove he had constructive possession of pseudoephedrine. He asserts no pseudoephedrine was actually located on his person, on his premises, or seized and taken into evidence from any location. Defendant also contends the evidence was insufficient to support his convictions of a precursor chemical because the State did not present any testimony from any pharmacist or store clerk identifying him as the individual who actually made particular purchases of pseudoephedrine on particular dates. We disagree.
 

 The State charged Defendant with thirty-five counts of possession of a precursor chemical based upon his alleged purchases and possession of pseudoephedrine. The trial court admitted into evidence a summary, created by Detective Galloway, of the records of pseudoephedrine purchases for Moss, Lanuto, Tallent, Cook, and Defendant. Detective Galloway testified this summary showed Defendant's ID was used to purchase pseudoephedrine from Walgreens and Walmart on thirty-five separate occasions. Five additional purchases were blocked when Defendant's ID was used in attempt to purchase pseudoephedrine.
 

 *445
 
 Moss testified she and Defendant purchased pseudoephedrine. She admitted she had seen Defendant "cooking meth" numerous times, and assisted him in the process. Lanuto, Tallent, and Cook all testified they had purchased pseudoephedrine for Defendant on several occasions. Lanuto also witnessed Defendant cooking methamphetamine. Agents on the scene documented a number of empty Sudafed and Sufedrin blister packs, and at least two empty Sudafed boxes-both of which are products containing pseudoephedrine.
 

 Substantial evidence was admitted from which a jury could reasonably find and conclude Defendant possessed pseudoephedrine to support his conviction of thirty-five counts of a precursor chemical to methamphetamine. This argument is overruled.
 

 (b) Insufficient Evidence of a Controlled Substance
 

 Defendant argues the State presented insufficient evidence to prove the items he allegedly possessed were actually controlled substances. He asserts no chemical analysis or testimony about the chemical makeup of the particular items purchased was presented. We disagree.
 

 Our Supreme Court has held chemical analysis is required to accurately identify
 
 controlled substances:
 

 [T]hroughout the lists of Schedule I through VI controlled substances found in sections 90-89 through 90-94, care is taken to provide very technical and "specific chemical designations" for the materials referenced therein.... These scientific definitions imply the necessity of performing
 
 *141
 
 a chemical analysis to accurately identify
 
 controlled substances
 
 before the criminal penalties of N.C.G.S. § 90-95 are imposed.
 

 State v. Ward,
 

 364 N.C. 133
 
 , 143,
 
 694 S.E.2d 738
 
 , 744 (2010) (emphasis supplied).
 

 Defendant was charged with, and a jury convicted him of, thirty-five counts of possession of pseudoephedrine, a precursor chemical to methamphetamine, under N.C. Gen.Stat. § 90-95. N.C. Gen.Stat. § 90-95(d1)(2)(a) (2013). The necessity of performing chemical analysis is limited to
 
 controlled substances.
 
 N.C. Gen.Stat. § 90-87 defines "controlled substance" as "a drug, substance, or immediate precursor included in Schedules I through VI of [the North Carolina Controlled Substances Act]." N.C. Gen.Stat. § 90-87(5) (2013). Pseudoephedrine is
 
 not
 
 listed as a controlled substance under Schedules I through VI in
 
 *446
 
 N.C. Gen.Stat. §§ 90-89 through 90-94. Pseudoephedrine is a precursor chemical, not a controlled substance, and a chemical analysis was not required to support Defendant's convictions of possession of pseudoephedrine. This argument is without merit and is overruled.
 

 IV. Conclusion
 

 Defendant failed to assert and preserve his argument that a fatal variance existed between the indictment and the proof at trial.
 

 The State presented substantial evidence Defendant possessed pseudoephedrine, a precursor chemical to methamphetamine. The State was not required to present evidence that a chemical analysis was performed to establish the identity of pseudoephedrine. The trial court did not err by denying Defendant's motion to dismiss for insufficient evidence.
 

 Defendant received a fair trial free from prejudicial errors he preserved and argued. We find no error in Defendant's conviction or the judgment entered thereon.
 

 NO ERROR.
 

 Judges BRYANT and GEER concur.