IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA19-692

Filed: 16 June 2020

Guilford County, No. 18CRS078747-48, 18CRS024601

STATE OF NORTH CAROLINA

v.

BILLY RAY WILLIAMSON, Defendant.

Appeal by Defendant from judgment entered 27 February 2019 by Judge John O. Craig, III, in Guilford County Superior Court. Heard in the Court of Appeals 14 April 2020.

*Attorney General Joshua H. Stein, by Assistant Attorney General Neal T. McHenry, for the State.*

*Appellate Defender Glenn Gerding, by Assistant Appellate Defender Candace Washington, for Defendant.*

BROOK, Judge.

Billy Ray Williamson ("Defendant") appeals from judgment entered upon jury verdicts for common law robbery, attempted robbery with a dangerous weapon, and having attained the status of habitual felon. On appeal, Defendant argues the trial court erred in denying Defendant's motion to dismiss the charge of attempted robbery with a dangerous weapon based on both fatal variance and insufficiency of the evidence. Defendant further argues that the trial court impermissibly expressed its opinion during witness testimony and jury instructions and that those remarks

prejudiced him and infringed his right to a fair trial. Lastly, Defendant argues the trial court erred in accepting his stipulation to habitual felon status because it did not conduct the requisite guilty plea colloquy, nor did it submit the issue to the jury.

We conclude that Defendant's fatal variance argument is not preserved for our review. We agree with Defendant, however, that the trial court erred in denying Defendant's motion to dismiss the attempted robbery with a dangerous weapon charge based on insufficiency of the evidence and in accepting his stipulation as to having attained the status of habitual felon. For the following reasons, we also hold that Defendant has not demonstrated that any allegedly improper opinions expressed by the trial court amounted to prejudicial error.

## I. Factual and Procedural Background

In February 2018, Blaise Gamua opened a tire shop in Greensboro, North Carolina, and Defendant and Defendant's fiancée, Erin Saunders, supplied Mr. Gamua with tires to sell at his shop. Defendant and Ms. Saunders would bring used tires to Mr. Gamua, and Mr. Gamua would select the tires he wanted and pay Defendant and Ms. Saunders between $2 and $5 a tire. On or around 25 June 2018, Defendant and Mr. Gamua agreed that Defendant could buy a used tire machine that was "sitting in" the shop unused in exchange for $900 worth of used tires. They agreed that the value of the tires Defendant delivered to Mr. Gamua each day would go toward payment for the tire machine.

On the afternoon of 28 June 2018, Defendant and Ms. Saunders went to Mr. Gamua's tire shop to drop off tires. However, a dispute arose between Mr. Gamua and Ms. Saunders over the value of tires they had provided to Mr. Gamua. Ms. Saunders claimed they had already put $500 toward the tire machine, and Mr. Gamua argued that there was "no way. It's not been $500." Mr. Gamua testified that Ms. Saunders started yelling at him and accused him of "trying to play" them. Defendant did not argue and instead stated, "Babe, don't worry. I know what to do. Let's go."

Later that evening, Defendant and Ms. Saunders returned to Mr. Gamua's tire shop with their son and their son's girlfriend. Mr. Gamua was not there; another employee, Tyrone McNeill, had started his overnight shift. Mr. McNeill testified that when Defendant arrived at the tire shop, Defendant stated, "I have a gun. I come to get my tire machine." Mr. McNeill testified that Defendant had a gun holstered on his pants and then put it on the dashboard of his truck. Defendant then walked away from the gun to load the tire machine. It took Defendant 30 minutes to load the tire machine onto his truck, and Mr. McNeill testified that, though he felt threatened by Defendant and was scared during this time, Defendant did not directly threaten him. Security footage that was played for the jury showed that during the 30 minutes Defendant was loading the tire machine, Mr. McNeill talked with Ms. Saunders, smoked a cigarette she had given him, and stood by watching as they loaded the tire

machine.  Mr. McNeill also helped Defendant load the tire machine.  Defendant, Ms. Saunders, their son, and their son's girlfriend then left with the tire machine.

Around 8:00 p.m., Mr. Gamua returned to the tire shop and noticed that the tire machine was gone.  Mr. McNeill told Mr. Gamua that Defendant had taken the machine and to "be careful.  [Defendant] has a gun."  Mr. Gamua testified that he went to get some gas while he waited for Defendant to return.  When Mr. Gamua came back to the tire shop, Defendant had returned to take another machine.  Ms. Saunders testified that Mr. Gamua drove into the shop at a very fast speed, jumped out of his car, and immediately asked about the tire machine they had taken.  She testified that she told Mr. Gamua that they had already paid for the tire machines, and Mr. Gamua called her a liar.

Defendant then walked towards Mr. Gamua's car with what appeared to be a small pistol in his waist.  Mr. Gamua told Defendant he could not take the tire machine, and Defendant pulled out the gun and pointed it at his head.  Mr. Gamua testified that he raised his hands up and stated, "[Defendant], please don't shoot me. Do not do this."  Defendant proceeded to yell at Mr. Gamua.  Mr. Gamua testified that Defendant then went to his truck and pulled out another gun that Mr. Gamua testified looked like a sniper rifle and pointed it at Mr. Gamua from a farther distance.  Mr. Gamua testified he believed both of the guns Defendant pointed at him

were real firearms. Mr. Gamua called 911, and Defendant left with Ms. Saunders, their son, and their son's girlfriend.

On 29 June 2018, Detective C.F. Holliday served arrest warrants on Defendant and obtained Defendant's consent to search his residence. The search team found a handgun revolver, a holster, and a "long gun type rifle with a scope." The search team also found what appeared to be a gun magazine but actually held BBs or pellets. Detective Holliday also testified that they recovered six pellets[1] that "appeared to go with" the revolver. However, she acknowledged she did not "understand the whole makeup" of the pellets. Detective Holliday further testified that the handgun found in Defendant's home that she believed was used on 28 June 2018 had a C02 cartridge. Detective Holliday did not testify how either weapon worked or what their capabilities were, and both she and the State subsequently conceded that she was not a firearms expert.

Defendant was charged with robbery with a dangerous weapon, attempted robbery with a dangerous weapon, and having attained the status of habitual felon. The robbery with a dangerous weapon and attempted robbery with a dangerous weapon charges pertained, respectively, to the initial interaction between Defendant

---

[1] These projectiles are referred to as "ammunition" in the evidence log, "BBs or pellets or something" and "bullets" by Detective Holliday, and "pellets" in the trial transcript. For the sake of consistency and clarity, we refer to the projectiles in question as pellets throughout this opinion. As discussed below in greater detail, the exact nomenclature used for the projectiles is not outcome determinative.

and Mr. McNeill and the subsequent interaction between Defendant, Mr. Gamua, and Mr. McNeill.

Defendant was tried before a jury on 25 February 2019. At the close of the State's evidence, Defendant moved to dismiss for insufficient evidence. Defendant argued that the State failed to show that the weapons used during the commission of the offenses were dangerous weapons and failed to show that they were capable of threatening human life since the evidence showed that one of the weapons operated with C02 and not gun powder and the other was a pellet rifle. The trial court denied Defendant's motion, stating,

> THE COURT: I have a pellet rifle and I use it to hunt squirrels. And from a distance of 30 to 35 feet, I can put that pellet plumb through a squirrel and it - - squirrels have tough hi[d]es, so, you know. . . . making my point, though. It's not a BB gun. It's not an air-soft. In fact, neither of these are BB guns.
>
> The pistol is an intriguing thing to me[] because I've never seen anything like it. It has a - - it has a cartridge and a jacket, a hollow-point jacket on the end of it; that while that hollow-point would probably mushroom out and not kill you, it might very well penetrate the skin and it would hurt like the dickens, much more than a BB would or certainly more than an air-soft.
>
> . . .
>
> Now the jury instructions, as I have them, tell the jury that they can infer from the evidence that it appeared to be a dangerous weapon; therefore - - and *there's been no testimony in the evidence. A lot of what I'm talking about, these guns, comes from my own personal observations of*

> *them [] because I [] have a working knowledge of how a*
> *pellet rifle works. But the detective did not profess to know*
> *anything about these weapons and . . . how they work or*
> *what they shot or anything else. And Mr. Gamua certainly*
> *did not, because he said he's not familiar with guns.*

(Emphasis added.)

Defendant then called his only witness, Ms. Saunders. Ms. Saunders testified that "[Mr. Gamua] had called us in prior days to come get those machines, otherwise we would not have went and got them." Ms. Saunders testified that prior to driving to Mr. Gamua's tire shop on 28 June 2018, she and Defendant were with their son and their son's girlfriend at the park playing with "air-soft pistols." She testified that was the reason Defendant had the two weapons when they went to Mr. Gamua's tire shop later that evening. The trial court then interrupted her and stated:

> THE COURT: Okay. Let me - - let me stop for just a
> minute. I want to instruct [Ms.] Saunders that these are
> not air-soft pistols. They are in no way to be characterized
> as that[] because they're simply not. So you can call them
> whatever else, pellet . . . whatever, but not airsoft.

At the close of all evidence, Defendant renewed his motion to dismiss, and the trial court again denied the motion. The trial court then instructed the jury on robbery with a dangerous weapon, attempted robbery with a dangerous weapon, common law robbery, and attempted common law robbery.

During jury deliberations, the trial court put on the record that Defendant was "willing to stipulate to having achieved the status of habitual felon, so that it will not

be necessary to put on evidence or any testimony" if Defendant was convicted of the felony.

The jury returned verdicts of guilty of common law robbery for the offense against Mr. McNeill and of attempted robbery with a dangerous weapon for the subsequent offense against Mr. Gamua and Mr. McNeill. The trial court consolidated the convictions and sentenced Defendant as a habitual felon to 102 to 135 months' active imprisonment. Defendant timely noticed appeal.

## II. Analysis

On appeal, Defendant raises three arguments. First, that the trial court erred in denying Defendant's motion to dismiss the charge of attempted robbery with a dangerous weapon based on both fatal variance and insufficiency of the evidence. Second, that the trial court impermissibly expressed its opinion (1) during witness testimony such that it discredited the witness and "undercut" Defendant's theory that "he had provided enough used tires to have a claim of right to the tire machines," and (2) when it instructed the jury on the charge of attempted robbery with a dangerous weapon and whether the State had proved that the weapon was dangerous. And third, that the trial court erred in accepting Defendant's stipulation as to attaining the status of habitual felon without conducting the requisite colloquy per N.C. Gen. Stat. § 15A-1022.

We hold that Defendant's fatal variance argument is not preserved for our review. We agree with Defendant that the trial court erred in denying Defendant's motion to dismiss the charge of attempted robbery with a dangerous weapon based on insufficient evidence. Given our reversal of the denial of the motion to dismiss, we do not reach Defendant's argument as to any alleged improper statements during jury instructions on this offense and hold that Defendant has failed to show that he was prejudiced by any alleged improper statement during witness testimony. Finally, the State concedes, and we agree, that the trial court erred in accepting Defendant's stipulation to habitual felon status without complying with N.C. Gen. Stat. § 15A-1022.

## A. Standard of Review

This Court reviews the sufficiency of an indictment and a trial court's denial of a motion to dismiss de novo. *State v. Hooks*, 243 N.C. App. 435, 441-42, 777 S.E.2d 133, 138 (2015) (citation omitted). Because the prohibition on the trial court expressing any opinion in the presence of the jury on any question of fact to be decided by the jury and the requirements for accepting a defendant's stipulation to habitual felon status are statutory mandates, *State v. Young*, 324 N.C. 489, 494, 380 S.E.2d 94, 97 (1989) (prohibition on expression of opinion); *State v. Marzouq*, ___ N.C. App. ___, ___, 836 S.E.2d 893, 898 (2019) (guilty plea requirements), they are also subject to de novo review, *State v. Johnson*, 253 N.C. App. 337, 345, 801 S.E.2d 123, 128

(2017). "Under a *de novo* review, th[is C]ourt considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." *State v. Williams*, 362 N.C. 628, 632-33, 669 S.E.2d 290, 294 (2008) (citation and marks omitted).

### B. Motion to Dismiss for Fatal Variance

Briefly, we address Defendant's argument that his motion to dismiss should have been granted because the variance between the evidence presented at trial and the allegation of a firearm in the indictments was fatal.

"In order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context." N.C. R. App. P. 10(a)(1). "In order to preserve a fatal variance argument for appellate review, a defendant must specifically state at trial that a fatal variance is the basis for his motion to dismiss." *State v. Scaturro*, 253 N.C. App. 828, 833-34, 802 S.E.2d 500, 505 (2017).

Here, Defendant based his motion to dismiss solely on insufficiency of the evidence. Defendant therefore "has waived his right to appellate review of this issue because he failed to properly preserve it at trial." *Id.* at 834, 802 S.E.2d at 505. Though Defendant requests that we review this issue pursuant to Rule 2 of the North Carolina Rules of Appellate Procedure, in our discretion we decline to do so.

### C. Motion to Dismiss for Insufficiency of the Evidence

Defendant next argues that the trial court erred in denying his motion to dismiss the charges of robbery and attempted robbery with a dangerous weapon because there was insufficient evidence of the use of a dangerous weapon.

> When a defendant moves for dismissal, the trial court is to determine whether there is substantial evidence (a) of each essential element of the offense charged, or of a lesser offense included therein, and (b) of defendant's being the perpetrator of the offense. If so, the motion to dismiss is properly denied.

*State v. Earnhardt*, 307 N.C. 62, 65-66, 296 S.E.2d 649, 651-52 (1982). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 66, 296 S.E.2d at 652 (internal marks and citation omitted). "In deciding a motion to dismiss, the evidence should be viewed in the light most favorable to the State." *State v. Mucci*, 163 N.C. App. 615, 618, 594 S.E.2d 411, 414 (2004).

North Carolina General Statutes § 14-87 defines robbery with a firearm or dangerous weapon as the unlawful taking, or attempted taking, of personal property while "having in possession or with the use or threatened use of any firearms or other dangerous weapon, implement or means, whereby the life of a person is endangered or threatened[.]" N.C. Gen. Stat. § 14-87(a) (2019). A firearm is defined as "[a] handgun, shotgun, or rifle which expels a projectile by action of an explosion." *Id.* § 14-409.39(2). If a weapon is not a firearm, then "to be considered dangerous under this statute, the determinative question is whether the evidence was sufficient to

support a jury finding that a person's *life* was in fact endangered or threatened."
*State v. Westall*, 116 N.C. App. 534, 538, 449 S.E.2d 24, 27 (1994) (emphasis in original) (internal marks and citation omitted).

"Our Supreme Court has established rules with which to resolve sufficiency of evidence questions in armed robbery cases where the instrument used appears to be[] but may not in fact be a dangerous weapon capable of endangering or threatening life." *State v. Summey*, 109 N.C. App. 518, 528, 428 S.E.2d 245, 251 (1993). Those rules are:

> (1) When a robbery is committed with what appeared to the victim to be a firearm or other dangerous weapon capable of endangering or threatening the life of the victim and there is no evidence to the contrary, there is a mandatory presumption that the weapon was as it appeared to the victim to be.
>
> (2) If there is some evidence that the implement used was not a firearm or other dangerous weapon which could have threatened or endangered the life of the victim, the mandatory presumption disappears leaving only a permissive inference, which permits but does not require the jury to infer that the instrument used was in fact a firearm or other dangerous weapon whereby the victim's life was endangered or threatened.
>
> (3) If all the evidence shows the instrument could not have been a firearm or other dangerous weapon capable of threatening or endangering the life of the victim, the armed robbery charge should not be submitted to the jury.

*State v. Allen*, 317 N.C. 119, 124-25, 343 S.E.2d 893, 897 (1986). Our Supreme Court summarized its holdings in this area as follows:

> In an armed robbery case[,] the jury may conclude that the weapon is what it appears to the victim to be in the absence of any evidence to the contrary. If, however, there is any evidence that the weapon was, in fact, not what it appeared to the victim to be, the jury must determine what, in fact, the instrument was. *Finally, if other evidence shows conclusively that the weapon was not what it appeared to be, then the jury should not be permitted to find that it was what it appeared to be.*

*Id.* at 125, 343 S.E.2d at 897 (emphasis added).

Whether or not the case merits submission to the jury, and if it does then which instruction the jury receives, is dependent on the evidence presented. If a defendant uses "a dangerous weapon *per se*[,] . . . there is a mandatory presumption that the victim's life was *in fact* endangered or threatened." *State v. Wiggins*, 78 N.C. App. 405, 407-08, 337 S.E.2d 198, 199-200 (1985) (emphasis in original) (upholding instruction that a box cutter was a dangerous weapon as a matter of law where its "sharply pointed razor blade [was] clearly capable of producing death or great bodily harm" and was held "a couple of inches from [the victim's] side[.]"). Where there is "contradictory testimony . . . as to the nature of the weapon used[,]" the jury is permitted, but not required, to infer that the weapon used was what it reasonably appeared to the victim to be. *State v. Duncan*, 136 N.C. App. 515, 516-18, 524 S.E.2d 808, 809-10 (2000) (holding "resolution of this factual dispute within the province of the jury" where the victim testified the defendant used a "two barreled, silver handgun[,]" and the defendant testified that the gun "was incapable of firing a

bullet."). The jury, however, should not be so instructed "if other evidence shows conclusively that the weapon was not what it appeared to be," *Allen*, 317 N.C. at 125, 343 S.E.2d at 897, and the State fails to introduce evidence of the weapon's "capability to inflict death or great bodily injury[,]" *State v. Fleming*, 148 N.C. App. 16, 22, 557 S.E.2d 560, 564 (2001).

Pellet guns, BB guns, and air guns (or airsoft guns), "are [not] firearms[] because they do not use gunpowder explosions to propel their projectiles." Jeff Welty, *Air Guns*, UNC School of Government Criminal Law Blog (9 November 2011), https://nccriminallaw.sog.unc.edu/air-guns/ (last visited 4 June 2020); *see also* N.C. Gen. Stat. § 14-409.39(2) (2019) (firearm "expels a projectile by action of an explosion"). In dealing with these non-firearm weapons, our appellate courts have declined to hold that these instruments are dangerous as a matter of law. *See, e.g.*, *Fleming*, 148 N.C. App. at 24-25, 557 S.E.2d at 565; *State v. Chapman*, 244 N.C. App. 699, 715-16, 781 S.E.2d 320, 331-32 (2016). Instead, if "a weapon such as a BB gun is determined to be the weapon used in a particular case, the record must contain evidence to support the jury's finding that the instrument was a dangerous weapon." *Fleming*, 148 N.C. App. at 26, 557 S.E.2d at 566. If there is such evidence, then the jury is permitted to determine whether it is a dangerous weapon. *Id.* at 22, 557 S.E.2d at 564. If not, then a defendant is entitled to dismissal of the robbery with a dangerous weapon charge. *Id.* at 26, 557 S.E.2d at 566.

In prior cases involving pellet or BB guns and the like where the defendant did not inflict a serious injury with the weapon, we have held that the State presented adequate evidence to establish the dangerousness of the weapon to merit submission of the charge to the jury.[2]  For example, in *State v. Hall*, 165 N.C. App. 658, 665-66, 599 S.E.2d 104, 108-09 (2004), we held that the State presented sufficient evidence of the dangerous nature of a BB gun that was used during the commission of a robbery by demonstrating that "it was capable of denting a quarter-inch piece of cedar plywood at distances up to two feet" and that the defendant had pointed the weapon at the victim's face from a distance of six to eight inches.  Similarly, "there was clearly sufficient evidence to permit the jury to decide whether [the] defendant committed robbery with a dangerous weapon" where evidence showed that (1) the defendant had placed a pellet gun directly against the victim's back; and (2) the pellet gun was capable of "totally penetrating a quarter-inch of plywood[.]"  *Westall*, 116 N.C. App. at 540-41, 449 S.E.2d at 28.  And, in *Chapman,* the defendant was convicted of robbery with a dangerous weapon after he had aimed an air pistol at a cashier's head and upper body and then pressed the air pistol into the clerk's ribs.  244 N.C. App. at 701, 781 S.E.2d at 323.  The State introduced videotaped experiments of a detective shooting the air pistol at a quarter-inch plywood target, and the pistol's user manual

---

[2] If such a weapon does inflict serious bodily injury, then the inquiry is resolved.  *See, e.g.*, *State v. Pettiford*, 60 N.C. App. 92, 99, 298 S.E.2d 359, 393 (1982) ("The victim was shot [with a pellet gun] at close range and a metal slug lodged in his head[,]" clearly demonstrating that the weapon "was likely to cause death or great bodily harm[.]").

which stated that the air pistol was capable of firing projectiles at a speed of 440 feet per second and was dangerous from a distance of 325 yards in order to demonstrate that it was a dangerous weapon for purposes of N.C. Gen. Stat. § 14-87. *Id.* at 716, 781 S.E.2d at 332.

In contrast, in *Fleming*, we concluded that the trial court erred in denying a defendant's motion to dismiss the armed robbery charge where there was no "evidence in the record of the BB gun's capability to inflict death or great bodily injury." 148 N.C. App. at 25, 557 S.E.2d at 565. The only evidence the State presented in support of the charged offense was that the defendant walked into a store, showed the cashier what appeared to be a gun in his waistband, and ordered her to fill a bag with cash. *Id.* at 18, 557 S.E.2d at 561-62. A search incident to arrest revealed that the weapon in the defendant's waist was a BB gun. *Id.*, 557 S.E.2d at 562. While "[the] defendant's case could" have been submitted to the jury for determination of whether the weapon in fact posed a grave danger "[h]ad the State presented" some evidentiary support thereof, dismissal was necessary where it did not. *Id.* at 22, 557 S.E.2d at 564.

The same is true in the instant case. Though Mr. Gamua testified he believed both of the guns were real firearms, and Mr. McNeill testified that he felt threatened by Defendant's gun, the evidence "conclusively" showed "that the weapon[s] w[ere] not what [they] appeared to be[.]" *Allen*, 317 N.C. at 125, 343 S.E.2d at 897. More

specifically, the weapons used during the commission of these offenses were not

firearms but instead an air pistol powered by a C02 cartridge and a pellet rifle.

Accordingly, the State needed to introduce evidence of the weapons' "capability to

inflict death or great bodily injury" to merit submission to the jury. *See Fleming*, 148

N.C. App. at 22, 557 S.E.2d at 564. The trial court summarized the evidence on this

point best, stating,

> [T]here's been no testimony in the evidence. A lot of what
> I'm talking about, these guns, comes from my own personal
> observations of them or because I [] have a working
> knowledge of how a pellet rifle works. But the detective
> did not profess to know anything about these weapons . . .
> how they work or what they shot or anything else. And Mr.
> Gamua certainly did not, because he said he's not familiar
> with guns.[3]

Though Detective Holliday testified that she recovered pellets that "appear[ed] to go

with the . . . handgun revolver[,]" she also testified that she did not understand their

"whole makeup[.]" She acknowledged and the State later underlined that Detective

Holliday "wasn't an expert [on firearms] and she really didn't know" how either

weapon worked. And, though the trial court professed to "have a working knowledge

---

[3] The capabilities of a pellet rifle and air gun, as is plain from our above discussion of our case law, are not "matter[s] of common knowledge," *Hinkle v. Hartsell*, 131 N.C. App. 833, 836, 509 S.E.2d 455, 458 (1998), and thus the State was required to introduce evidence of how they worked, *id.* at 837, 509 S.E.2d at 458 (holding whether an area was a "high crime area" was not a fact subject to judicial notice but should have been established through testimony and "[t]here [was] no indication in the record about whether the trial court actually heard evidence regarding the criminal activity at the Country Manor Inn.").

of how a pellet rifle works," it noted that "[t]he pistol is an intriguing thing to me, because I've never seen anything like it." In fact, the only testimony that was presented on how the weapons worked came from Ms. Saunders, who testified that she and her family had been "at the park playing" with them on the day in question, and that, though she had been shot by a pellet from the air gun before, they typically "shoot at targets."

In short, and unlike in the cases cited above, where there was evidence in the record of the instruments' capability to inflict death or great bodily injury, there was no such evidence here. The State presented no evidence whatsoever regarding the respective instruments' ability to cause injury, if any, at the distance from which they were brandished. *See Hall*, 165 N.C. App. at 665-66, 599 S.E.2d at 108. The only testimony that was presented on how the weapons worked suggested they had a rather limited capacity, as Ms. Saunders indicated both were used at a park and she had been shot with a pellet from the air gun, with no reported grave injury therefrom. Though the trial court submitted the charge to the jury, instructing them they were permitted to infer that the weapon used was what it appeared to the victim to be, there were no contradictions to resolve nor anything from which to infer—these were not firearms and there was absolutely no testimony or evidence suggesting they posed a grave danger. *See Duncan*, 136 N.C. App. at 517-18, 524 S.E.2d at 810.

Relying on *Westall* and *Pettiford*, the State contends that there was sufficient evidence to submit the charges of robbery and attempted robbery with a dangerous weapon to the jury because "there was testimony from both victims that [] [D]efendant pointed his handgun/revolver pellet gun at them" and that Defendant "pointed the handgun/revolver at [Mr. Gamua's] head at close range."

While these statements are certainly true—that, most notably, Mr. Gamua testified that Defendant pointed a "handgun/revolver" at his head at close range and a "sniper rifle" from farther away—they are not evidence that demonstrates the dangerous character of the weapons. Instead of supporting the State's position, *Pettiford* and *Westall* merely reinforce the principle that there must be evidence in the record of the weapons' capability to inflict death or serious bodily injury. *See Pettiford*, 60 N.C. App. at 99, 298 S.E.2d at 393 (pellet gun actually inflicted serious injury); *Westall*, 116 N.C. App. at 540-41, 449 S.E.2d at 28 (testimony that pellet gun could shoot through plywood). Had the evidence not conclusively established that the weapons used were an air pistol and a pellet rifle, the testimony of Mr. McNeill and Mr. Gamua certainly would have been sufficient to support a mandatory presumption or permissive inference instruction. *See Allen*, 317 N.C. at 125, 343 S.E.2d at 897. However, "all the evidence" showed that they *were* an air pistol and a pellet rifle and, thus, in order to submit the armed robbery charge to the jury, there must have been evidence of the weapons' "capability to inflict death or seriously bodily injury." *See*

*Fleming*, 148 N.C. App. at 22, 557 S.E.2d at 564. Indeed, the State ventures in the realm of conjecture by assuming that the weapons used here could have inflicted death or serious bodily injury. *See Allen*, 317 N.C. at 122, 343 S.E.2d at 896 ("[T]he law does not transform [] an instrument into a dangerous weapon merely because it appears to be one.").

As we concluded in *Fleming*, because there was "evidence that the implement used was not a firearm or other dangerous weapon[,]" 148 N.C. App. at 22, 557 S.E.2d at 564, "the record must contain evidence to support the jury's finding that the instrument was a dangerous weapon[,]" *id.* at 26, 557 S.E.2d at 566. "Such evidence is lacking in the case at bar." *Id.* at 25, 557 S.E.2d at 565. The trial court therefore erred in denying Defendant's motion to dismiss the charge of attempted robbery with a dangerous weapon, and we must remand the case to the trial court for resentencing on the lesser included offense of attempted common law robbery. *Id.* at 26, 557 S.E.2d at 566.[4]

---

[4] After we "conclude[] that a defendant's conviction was not supported by sufficient evidence[,] . . . our long-standing practice has been to determine whether the evidence presented was sufficient to support a lesser included offense of the convicted crime." *State v. Stokes*, 367 N.C. 474, 474, 756 S.E.2d 32, 33 (2014). Common law robbery is a lesser included offense of armed robbery, *State v. Harris*, 91 N.C. App. 526, 527, 372 S.E.2d 336, 337 (1988), since "[t]he critical and essential difference between armed robbery and common law robbery is that in order for the jury to convict for armed robbery the victim must be endangered or threatened by the use or threatened use of a firearm or other dangerous weapon, implement or means[,]" *State v. Thompson*, 297 N.C. 285, 287, 254 S.E.2d 526, 527 (1979) (internal marks and citation omitted). Though we have concluded that there was not sufficient evidence to support the attempted armed robbery charge, and as discussed below in further detail, there is sufficient "evidence to support . . . the lesser included [] offense[]." *State v. Adams*, 187 N.C. App. 676, 683, 654 S.E.2d 711, 716 (2007).

## D. Improper Opinion

We next consider whether the trial court impermissibly expressed its opinion in violation of N.C. Gen. Stat. § 15A-1222.

A trial court is prohibited from expressing "any opinion in the presence of the jury on any question of fact to be decided by the jury." N.C. Gen. Stat. § 15A-1222 (2019). Whether a trial court's comment constitutes an improper expression of opinion "is determined by its probable meaning to the jury, not by the judge's motive." *State v. McEachern*, 283 N.C. 57, 59-60, 194 S.E.2d 787, 789 (1973). In determining whether the remark was improper, "a totality of the circumstances test is utilized" under which the defendant has the burden of showing prejudice. *State v. Anthony*, 354 N.C. 372, 402, 555 S.E.2d 557, 578 (2001) (citation omitted).[5] A defendant is not entitled to a new trial "if the statement, considered in the light of all the facts and attendant circumstances, is not of such prejudicial nature as could reasonably have

---

[5] Defendant argues that the trial court's alleged violation of N.C. Gen. Stat. § 15A-1222 here is structural error and therefore does not require a showing of prejudice, pointing to *Williams v. Pennsylvania*, ___ U.S. ___, 136 S. Ct. 1899, 195 L. Ed. 2d 132 (2016). Assuming without deciding that this issue is preserved for our review, *Williams* is plainly distinguishable. *Williams* involved an appellate judge who participated in the adjudication of a case on which he had been involved as a prosecutor. *Id.* at 1903, 195 L. Ed. 2d at 138. The confidentiality of appellate court proceedings made a prejudice assessment impossible in those circumstances. *Id.* at 1909, 195 L. Ed. 2d at 145. The concerns here center on comments readily reviewable by our Court. Our Courts have reviewed such comments not through the lens of structural error but instead have required a showing of prejudice. *See, e.g.*, *State v. King*, 311 N.C. 603, 618, 320 S.E.2d 1, 11 (1984) ("A remark by the court is not grounds for a new trial if, when considered in the light of the circumstances under which it was made, it could not have prejudiced defendant's case.").

had an appreciable effect on the result of the trial." *State v. Teasley*, 31 N.C. App. 729, 732, 230 S.E.2d 692, 694 (1976).

In order to demonstrate prejudice, the defendant must show that "there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises." N.C. Gen. Stat. § 15A-1443(a) (2019). If "the judge's statement went to the heart of the trial, assuming [the] defendant's guilt[,]" then it will be considered prejudicial. *State v. Guffey*, 39 N.C. App. 359, 361, 250 S.E.2d 96, 97 (1979). In *State v. Springs*, 200 N.C. App. 288, 293, 683 S.E.2d 432, 435-36 (2009), we held that the trial court's remark that "Greer had 'no involvement with these charges'" constituted prejudicial error warranting a new trial where the defense's theory was that "Greer" had placed contraband in the defendant's apartment. "A reasonable interpretation of the statement [wa]s that Greer was not involved" in the offense, and "this topic was of utmost important to [the] defendant's defense." *Id.*

Defendant argues that the following exchange amounted to an improper expression of judicial opinion during Ms. Saunders' testimony:

> [DEFENSE COUNSEL]: Okay. So when did y'all decide to head over to the tire shop on the 28th?
>
> [MS. SAUNDERS]: On the 28th, we were with our son and our son's girlfriend and we had been at the park playing with the air-soft pistols. That's why we had them. And we came straight from the park to Mr. Gamua's shop.

[DEFENSE COUNSEL]: What time was that?

THE COURT: Okay. Let me - - let me stop for just a minute.

I want to instruct [Ms.] Saunders that these are not air-soft pistols. They are in no way to be characterized as that[] because they're simply not. So you can call them whatever else, pellet . . . whatever, but not airsoft.

Immediately prior, Ms. Saunders testified that the tire machine had been paid for, and Mr. Gamua told her and Defendant that they could pick it up.

Defendant argues that the trial court's interjection served to discredit Ms. Saunders's testimony and therefore undercut the defense theory "that [Defendant] had provided enough used tires to have a claim of right to the tire machines."[6] Assuming without deciding that error occurred, we hold that Defendant has failed to demonstrate that he was prejudiced by the allegedly improper expression of opinion.

Attempted common law robbery consists of "(1) [the] defendant's specific intent to commit the crime of common law robbery," which includes that the defendant knew he was not entitled to take the property, and "(2) a direct but ineffectual act by defendant leading toward the commission of this crime." *State v. Whitaker*, 307 N.C. 115, 118, 296 S.E.2d 273, 274 (1982); *see also* N.C.P.I. 217.30 (2018) (common law robbery jury instructions). The evidence at trial tended to show that Mr. Gamua,

---

[6] Defendant also argues that the trial court's comments undercut his defense as to the dangerous character of the weapon. Having concluded that the trial court should have granted his motion to dismiss the armed robbery charges, Defendant's argument on this point is moot.

Defendant, and Ms. Saunders had an agreement that Mr. Gamua would credit the value of the tires Defendant and Ms. Saunders brought toward the tire machine that belonged to Mr. Gamua. Mr. Gamua testified that they had all agreed that the tire machine would be considered paid in full once Mr. Gamua received $900 worth of tires. Mr. Gamua testified that as of 28 June 2018, he had not received the agreed-upon amount nor had he permitted Defendant to take the machine on that date. Both Mr. Gamua and Mr. McNeill testified that Defendant threatened them with what appeared to be a gun if they did not allow him to take the tire machine.

Considering the trial court's statement "in the light of all the facts and attendant circumstances," it was "not of such prejudicial nature as could reasonably have had an appreciable effect on the result of the trial." *Teasley*, 31 N.C. App. at 732, 230 S.E.2d at 694. The trial court's instruction to Ms. Saunders to refrain from using the term "air-soft pistols" had no direct bearing on whether Defendant was entitled to take the machine. And it certainly did not assume his guilt for the charges we hold were sufficiently supported by the evidence: common law robbery and attempted common law robbery. Even if we were to accept that the trial court's interjection negatively impacted the jury's view of Ms. Saunders's testimony generally, we hold that there is not "a reasonable possibility that, had the error in question not been committed, a different result would have been reached" by the jury in light of the above evidence. N.C. Gen. Stat. § 15A-1443(a) (2019).

E. Stipulation as to Habitual Felon Status

Lastly, Defendant argues that the trial court erred in accepting his stipulation to habitual felon status because it did not first conduct the required guilty plea colloquy, and the State concedes this error. For the following reasons, we agree.

This Court has held that the proceedings as to whether a defendant is a habitual felon should be treated by the trial court "as if the issue of habitual felon were a principal charge." *State v. Gilmore,* 142 N.C. App. 465, 471, 542 S.E.2d 694, 698 (2001) (citation omitted). Whether a defendant is a habitual felon can either be submitted to the jury or a defendant can enter a guilty plea to the charge. *Id.* at 471, 542 S.E.2d at 699. If a defendant chooses to plead guilty to the charge of being a habitual felon "in the absence of an inquiry by the trial court to establish a record of a guilty plea, [it] is not tantamount to a guilty plea." *Id.* Further, this Court has held that "a defendant's mere stipulation to predicate felonies is insufficient." *State v. Wilkins*, 225 N.C. App. 492, 497, 737 S.E.2d 791, 795 (2013). Also, in accordance with N.C. Gen. Stat. § 15A-1022, "a superior court judge may not accept a plea of guilty or no contest from the defendant without first addressing him personally[,]" assessing whether the plea is an informed choice, and finding a factual basis for the charge. N.C. Gen. Stat. § 15A-1022(a), (c) (2019).

Here, there is no indication in the record that the trial court addressed Defendant personally regarding his stipulation to the status of habitual felon. Rather, the trial court, prior to announcing the jury verdict, stated:

> THE COURT: [I] want to state for the record that [defense counsel] had indicated that his client is willing to stipulate to having achieved the status of habitual felon, so that it will not be necessary to put on evidence or testimony that in the event that the verdict is one which reflects the finding of guilty of a felony, which would then cause the habitual felon status to attach.

The trial court then confirmed with Defendant's attorney that Defendant was willing to make the stipulation. The record does not reflect that any additional discussions between the trial court and Defendant occurred regarding Defendant's stipulation to the status of habitual felon. Thus, the trial court did not establish a record of a guilty plea.

Since nothing in the record indicates that a guilty plea colloquy was conducted by the trial court regarding Defendant's stipulating to being a habitual felon, we must reverse Defendant's habitual felon conviction and remand to the trial court for further proceedings consistent with this opinion.

### III. Conclusion

For the reasons stated above, we hold that Defendant's fatal variance argument is not preserved. We also hold that the trial court erred in denying Defendant's motion to dismiss the charge of attempted robbery with a dangerous

weapon and remand for resentencing on the lesser included offense of attempted common law robbery and that the trial court erred in accepting Defendant's stipulation as to habitual felon status. Consistent with the reversal of the denial of Defendant's motion to dismiss, we further hold that Defendant has failed to demonstrate that the trial court's remarks prejudiced him.

NO PREJUDICIAL ERROR IN PART; REVERSED IN PART AND REMANDED.

Chief Judge McGEE and Judge MURPHY concur.