An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-223

Filed 5 November 2025

Guilford County, Nos. 21CR088036-400, 21CR088037-400, 21CR088038-400, 21CR088039-400, 21CR088040-400

STATE OF NORTH CAROLINA

v.

LEVAN LA FORREST SANDERS

Appeal by defendant from judgments entered 11 April 2024 by Judge Richard S. Gottlieb in Guilford County Superior Court. Heard in the Court of Appeals 15 October 2025.

> *Attorney General Jeff Jackson, by Assistant Attorney General Kristin Cook McCrary, for the State.*

> *Andrew Nelson, for defendant-appellant.*

ARROWOOD, Judge.

Levan La Forrest Sanders ("defendant") appeals from judgments after jury trial, in which he was convicted on five counts: accessory after the fact to first-degree murder; first-degree kidnapping; conspiracy to commit first-degree kidnapping; robbery with a dangerous weapon; and conspiracy to commit robbery with a

dangerous weapon. Defendant contends the trial court erred by denying his motion for a directed verdict and motion to dismiss on the charge of conspiracy to commit robbery with a dangerous weapon, because the robbery was complete before his involvement. Defendant also contends that the trial court erred by giving an acting in concert instruction for the charge. For the following reasons, we find no error.

## I. Background

The events in question occurred throughout the evening of 28 November 2021, in two phases, before and after defendant's direct involvement. Evidence offered at trial tended to show the following.

### A. Before Defendant's Direct Involvement

On the evening of 28 November 2021, Alhindi Abdalmahmoud ("Mr. Abdalmahmoud") was in his apartment using a dating app to arrange sex with a woman at his house in exchange for a Cash App payment. After receiving a message that she had arrived, he went outside to meet her and found no woman there. Two men, later identified as Rayshawn Hill and Tyrik Griffin, were outside in a sedan; Mr. Griffin raised his gun and demanded money from Mr. Abdalmahmoud's Cash App account. Mr. Abdalmahmoud produced his personal cell phone and opened Cash App, which was linked to his Wells Fargo bank account, and handed the device over to the men, who drove away with it.

Worried about his money, Mr. Abdalmahmoud called his friend, Taha Babiker ("Mr. Babiker"), from his second work cell phone. Mr. Babiker quickly came to Mr.

Abdalmahmoud's home and helped him close his Wells Fargo account. Mr. Abdalmahmoud then answered a knock on the door and found Mr. Griffin aiming the gun at him, having failed to access his money. Mr. Griffin then forced both men to leave the apartment at gunpoint and forced Mr. Babiker to retrieve his wallet from his car. In the car, Mr. Griffin and Mr. Hill took Mr. Babiker's cell phone and Mr. Abdalmahmoud's work phone, and Mr. Hill drove them to a BB&T Bank ATM, where Mr. Babiker had an account.

Mr. Griffin, still holding his gun, forced Mr. Babiker out of the car to use the ATM. Mr. Abdalmahmoud, who had been ordered to stay in the car with his head down, heard Mr. Hill shout, "He is trying to run!" followed by the sounds of running and two gunshots. Mr. Griffin returned to the car, which ran over something as they sped away, and Mr. Abdalmahmoud saw Mr. Babiker on the ground. Later that evening, police found Mr. Babiker deceased with a bullet hole through his abdomen and residue consistent with tire marks on his clothing. The jury viewed the bank's surveillance footage, which showed a man inserting his card at the ATM before running, another man running after him with an object in his hand, and a blue car driving in the same direction.

After leaving Mr. Babiker's body, Mr. Hill drove to a nearby apartment complex to make a series of phone calls to defendant and co-defendant Timothy Jones ("Mr. Jones"). Earlier, Mr. Hill and Mr. Griffin spent part of the day at defendant's home in High Point, where he lived with Mr. Jones, departing just after dusk.

B.      Defendant's Direct Involvement

According to phone records, Mr. Hill made two brief calls to Mr. Jones at 11:31 p.m. and Defendant at 11:36 p.m., followed by a 21-minute call to Mr. Jones beginning 11:40 p.m.  Mr. Jones testified that Mr. Hill awoke them to ask for a ride, and sent defendant the GPS location of an apartment complex in Greensboro.  Defendant drove his black Dodge car to the location with Mr. Jones and picked up Mr. Hill, Mr. Griffin, and Mr. Abdalmahmoud.  Defendant drove the group back to Mr. Abdalmahmoud's apartment, where Mr. Griffin forced him at gunpoint to retrieve his bank card.

Defendant then drove the group to two different ATMs, where Mr. Griffin forced Mr. Abdalmahmoud out of the car at gunpoint to make withdrawals, but both attempts were unsuccessful.  Out of fear, Mr. Abdalmahmoud did not tell the co-defendants that he had closed his account earlier.  Defendant punched Mr. Abdalmahmoud in the face twice and threatened to kill him unless he found a way to withdraw money.  Mr. Griffin also called a credit card company using Mr. Abdalmahmoud's phone, attempting to retrieve money, while Mr. Jones recorded his social security information.

Defendant drove the group to his home, where the group stayed for several hours while Mr. Griffin continued to hold Mr. Abdalmahmoud at gunpoint.  The group instructed him that when the bank opened, he would enter, act normally, and withdraw his money.  In the morning, Mr. Jones left the group to go to work, and defendant drove the men to a Wells Fargo branch, where Mr. Griffin again threatened

- 4 -

to kill Mr. Abdalmahmoud. Inside, Mr. Abdalmahmoud immediately told staff what was occurring, and Kernersville police responded to the scene. Detective E.J. Bruscino, who was already investigating the murder of Mr. Babiker for the Greensboro Police Department, arrived and found Mr. Abdalmahmoud "in a state of distress." Detective Bruscino then saw bank records that corroborated Mr. Abdalmahmoud's account of the preceding events.

Police located both of Mr. Abdalmahmoud's phones on a road between Kernersville and High Point. CSI J.T. Reynolds located a Ford wheel well liner at the BB&T location. At an apartment complex in Greensboro, police found a 2017 blue Ford Focus with a separated front bumper, flat front tire, and a missing wheel well liner. Forensic analysis found prints matching Mr. Griffin's on Mr. Abdalmahmoud's personal phone and the abandoned Ford Focus, and prints matching Mr. Jones' and defendant's on the exterior of the car. A shell casing found near Mr. Babiker's body matched the firearm from another incident in which Mr. Hill was shot. Mr. Abdalmahmoud identified defendant in photo identification lineups, claiming 100% certainty, and again at trial. Mr. Abdalmahmoud also identified defendant's voice in the State's video evidence, in which the voice discussed getting money from Mr. Abdalmahmoud's account.

### C.    Defendant's Trial

Defendant's three-week trial began 25 March 2024. Defendant moved to dismiss all charges at the close of the State's evidence, arguing specifically that the

robbery charge should be dismissed because it had been based on the taking of two of the cell phones. However, the trial court found that the State presented sufficient evidence and that the series of events constituted a continuous transaction, and denied the motion. Defendant did not present evidence in his defense and unsuccessfully moved to dismiss again. At both the charge conference and after the jury instructions, defendant's counsel unsuccessfully objected to the "acting in concert" language the court included in its instruction about the robbery charge.

The jury returned a guilty verdict on all counts. Defendant's counsel unsuccessfully moved for a directed verdict in defendant's favor. The trial court sentenced defendant to imprisonment to two consecutive terms of 96 to 128 months and an additional consecutive term of 84 to 113 months. Defendant gave notice of appeal in open court.

## II. Discussion

Defendant argues that the trial court erred by denying his motion to dismiss the robbery charge, by denying his motion for a directed verdict as to the robbery charge, and by including the "acting in concert" jury instruction as to the charge. We discuss each issue in turn.

### A. Defendant's Motion to Dismiss and Motion for a Directed Verdict

Defendant's main contention is that the robbery was complete before his involvement, because his co-defendants had already taken possession of the victims'

cell phones before defendant left home. Defendant argues that the trial court should have granted his motions to dismiss and for a directed verdict. We disagree.

### 1. Defendant Joined a Continuous Transaction

The required elements of robbery with a dangerous weapon include that the defendant: 1) unlawfully took or attempted to take another's personal property, 2) using or threatening to use a firearm or another dangerous weapon, 3) which threatened or endangered the victim's life. N.C.G.S. § 14-87(a); *State v. Hope*, 317 N.C. 302, 305 (1986).

Defendant asks us to compare this case to *State v. McNeil*, 155 N.C. App. 540 (2002), and *State v. Cole*, 209 N.C. App. 84 (2011). In *McNeil*, the defendant forced a store's employee to empty the cash register, then forced him to walk to the back of the store. *McNeil*, 155 N.C. App. at 541. He was convicted of second-degree kidnapping and robbery with a dangerous weapon. *Id.* He had argued that the restraint had occurred as part of the robbery, but the trial court found that the robbery was complete before the defendant restrained the employee. *Id.* at 544–47.

In *Cole*, the defendant drove with his nephew to buy drugs, his nephew stole the drugs and shot and killed the dealer, and the defendant drove them away together. *Cole*, 209 N.C. App. at 86–88. Defendant, charged as an accessory to robbery with a dangerous weapon, unsuccessfully argued that the robbery had not been completed until the pair arrived at "a place of safety" but the Court held that

"the taking in a robbery is complete" once the thief succeeds in removing the property from the victim's possession. *Id.* at 92.

Defendant is correct that the use or threatened use of force must generally induce the victim to part with his property. *Hope*, 317 N.C. at 305. *See also State v. Richardson*, 308 N.C. 470, 474–76 (1983) (holding that, to be found guilty of robbery, the defendant must "inten[d] to permanently deprive the owner of his property at the time the taking occurred[.]"). However, the State asserts that defendant participated in a series of events constituting a continuous transaction. This doctrine is applicable where the use of force is "so joined by time and circumstances with the taking as to be part of one continuous transaction." *State v. Olson*, 330 N.C. 557, 566 (1992). Where a robbery with a dangerous weapon is part of a continuous transaction, "the temporal order of the threat or the use of a dangerous weapon and the taking is immaterial." *Id.* Therefore, where a defendant participates in any threat of force "so joined by time and circumstances" to the taking, it is irrelevant whether the taking occurred before his participation. *Id.*

We agree the State's evidence in this case tended to show a proper application of the continuous transaction doctrine. As opposed to *McNeil* and *Cole*, where the robberies themselves had a clear temporal endpoint preceding the commission of the other crime charged, the record before us shows an active and ongoing armed robbery at the outset of defendant's active participation.

To illustrate, a hypothetical example will be helpful here. Mr. A knows that Mr. M keeps a large amount of cash in his office safe. Mr. A kidnaps Mr. M from his home and drives him to the office, where he holds Mr. M at gunpoint and forces him to hand over his gold-and-platinum keychain. Mr. A tries to open the safe, but none of the keys will fit. Mr. A's friend Mr. B is an experienced safe cracker, so he calls him to help break open the safe in exchange for a cut of the takings. As they continue to hold Mr. M at gunpoint, the two friends work unsuccessfully to open the safe until the police arrive. Mr. B would not be able to avoid responsibility for the armed robbery, even though the defendants were successful in taking possession of only a portion of the desired loot, and because the taking of the keychain preceded Mr. B's participation. This is because Mr. B joined a continuous transaction, in which the forceful robbery of the keychain was just one step in the ongoing series of crimes in which he acted in concert, making the timing of the taking immaterial.

So too here. The State's evidence, taken as a whole, tended to show that the phones' taking was only a part of the ongoing robbery, and a preliminary step taken to continue robbing the victims, during an unbroken and continuous series of actions that proceeded until long after defendant joined, accompanied by the nonstop threat of violent force. Accordingly, the time that the only successfully taken property changed hands is irrelevant.

### 2. Defendant Acted in Concert with Co-Defendants

A defendant "acts in concert" when he is present and "act[s] together with another who does the acts necessary to constitute the crime pursuant to a common plan or purpose to commit the crime." *State v. Joyner*, 297 N.C. 349, 357 (1979). "[I]f 'two persons join in a purpose to commit a crime, each . . . is also guilty of any other crime committed by the other in pursuance of the common purpose . . . or as a natural or probable consequence thereof.' " *State v. Waring*, 364 N.C. 443, 504 (2010) (quotes omitted).

Acting in concert does not require that all details of the crime be known to each co-defendant or worked out beforehand. *State v. Johnson*, 164 N.C. App. 1, 17 (2004), *disc. rev. denied*, 359 N.C. 194 (2004). The "presence" prong may be constructive, which is why getaway drivers are constructively present despite being at "a convenient distance away." *State v. Combs*, 182 N.C. App. 365, 370, *aff'd* 361 N.C. 585 (2007). The defendant's actual distance from the crime is irrelevant; the State must simply show he was near enough to render assistance if need be and to encourage the crime's actual perpetration. *Id.*

In the present case, defendant was convicted on the theory that he acted in concert with his co-defendants to commit robbery with a dangerous weapon. We established that the robbery did not end when the co-defendants forced the victims to hand over their phones, because Mr. Abdalmahmoud remained at gunpoint throughout the ongoing armed robbery. The State presented, over the course of the three-week trial, multiple strands of evidence showing that defendant actively

participated in this common plan to rob the victims of their phones and bank accounts by use of armed force, by joining his co-defendants, driving them to several locations, bringing Mr. Abdalmahmoud to his home to be held captive, and making violent threats against him. Therefore, the State's evidence was sufficient to show more than defendant's constructive presence and specific intent. It tended to show that he was not only near enough to render assistance and encouragement, but that he quickly swooped in to actively perpetrate the robbery.

3. The Trial Court Properly Denied Defendant's Motion to Dismiss and Motion for a Directed Verdict

This Court reviews *de novo* the trial court's denial of a motion to dismiss. *State v. Hooke*, 243 N.C. App. 435, 441 (2015). We determine whether the State presented substantial evidence of each essential element and that defendant perpetrated the charged offense. *State v. Mann*, 355 N.C. 294, 301 (2002) (quotes omitted). The evidence is considered in the light most favorable to the State, giving the State the benefit of all reasonable inferences. *Id.* "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith*, 300 N.C. 71, 78 (1980). "Circumstantial evidence may withstand a motion to dismiss and support a conviction even when the evidence does not rule out every hypothesis of innocence." *State v. Stone*, 323 N.C. 447, 452 (1988). "Courts may resort to circumstantial evidence of motive, opportunity, capability and identity to identify the accused as the perpetrator of the crime." *Id.* "The evidence need only

give rise to a reasonable inference of guilt in order for it to be properly submitted to the jury for a determination of defendant's guilt beyond a reasonable doubt." *Id.* "Contradictions and discrepancies are for the jury to resolve and do not warrant dismissal." *Smith*, 300 N.C. at 78. Our analysis of and standards concerning motions to dismiss and motions for a directed verdict are "interchangeable." *State v. Wynn*, 276 N.C. App. 411, 415 (2021).

Here, the State introduced multiple strands of evidence tending to show that defendant participated in a common scheme to (1) unlawfully take or attempt to take another's personal property, (2) use or threaten to use a firearm or another dangerous weapon, (3) which threatened or endangered the victim's life. The State's evidence was consistent with the theory that defendant was constructively and then actually present during an ongoing continuous transaction, which rendered irrelevant the timing of the physical taking vis-à-vis the use of force. A reasonable jury could have agreed that all elements of this crime and defendant's responsibility were proven beyond a reasonable doubt. Viewed in the light most favorable to the State, and allowing it all reasonable inferences, this evidence was sufficient to submit for the jury's consideration the charge of robbery with a dangerous weapon. Accordingly, the trial court properly denied defendant's motions, and we discern no error.

## B.     Jury Instructions

Defendant next argues that the court erred by giving instructions about "acting in concert" when advising the jury on the burden to find the defendant guilty on the

robbery with a dangerous weapon charge. Defendant's counsel objected to the instruction at trial, preserving it for *de novo* review. *State v. King*, 227 N.C. App. 390, 396 (2013).

To assist the jury to understand a case and reach its verdict, a trial judge is required to instruct the jury on every "substantial feature of a case raised by the evidence." *State v. Shaw*, 322 N.C. 797, 803 (1988) (citation omitted). To establish prejudice, the party asserting instructional error must show that the error was likely to mislead the jury. *King*, 227 N.C. App. at 396. The jury instruction discussed here is obligatory when the State's evidence tends to show that, pursuant to a "common plan or purpose to commit the crime," the defendant was present and acting together with another person whose actions constitute the crime. *State v. Mitchell*, 24 N.C. App. 484, 486 (1975).

We incorporate by reference our discussion above as to the continuous transaction and acting in concert. The State presented multiple strands of evidence, including forensic exhibits, audiovisual exhibits, and extensive testimony from Mr. Abdalmahmoud and co-defendant Mr. Jones. This evidence, taken as a whole, tended to show that defendant joined in a continuing transaction in which he and co-defendants jointly perpetrated the taking of property under threat of violence. As such, the trial court was required to issue its instruction about acting in concert, and it did so. The wording followed the North Carolina pattern jury instruction 202.10. Accordingly, we discern no error.

### III.   Conclusion

As to the trial court's jury instructions and its denials of defendant's motion to dismiss and motion for a directed verdict, we find no error.

NO ERROR.

Judges TYSON and ZACHARY concur.

Report per Rule 30(e).