STATE OF NORTH CAROLINA v. WILLIAM CONRAD HALL

No. COA03-1235

(Filed 3 August 2004)

**1. Kidnapping; Robbery— second-degree kidnapping—robbery with dangerous weapon—motion to dismiss—sufficiency of evidence—perpetrator of crime**

The trial court did not err by denying defendant's motion to dismiss the charges of robbery with a dangerous weapon and second-degree kidnapping even though defendant contends that there was insufficient evidence to show that defendant was the perpetrator of the crimes charged, because the evidence was sufficient taken as a whole to reveal that: (1) the robber wore a ski mask identical to the one seized from the residence of defendant's girlfriend; (2) one of the witnesses described the robber as having reddish-brown facial hair, and a detective described defendant as having a goatee and moustache; (3) a witness testified the robber took over two thousand dollars mostly in twenty dollar bills during the 16 June robbery, that same night defendant gave his girlfriend one thousand dollars in twenty dollar bills, and defendant offered different explanations for the source of the cash; (4) defendant was observed at a bowling alley located directly across from the convenience store where the robbery occurred several hours after the 2 June robbery; (5) detectives seized a BB gun and dark blue jumpsuit belonging to defendant, both of which were consistent with descriptions by witnesses of the gun and clothing used by the robber; and (6) defendant offered no evidence or innocent explanation for his actions at trial.

**2. Robbery— dangerous weapon—BB gun**

The trial court did not err by denying defendant's motion to dismiss the charges of robbery with a dangerous weapon even though defendant contends that the BB gun used in the robberies could not be considered a dangerous weapon, because: (1) where the instrument according to the manner of its use or the part of the body at which the blow is aimed may be likely to endanger the lives of the victims, its alleged deadly character is one of fact to be determined by the jury; and (2) the evidence showed that defendant committed the robberies by placing a BB gun directly into the backs of the store clerks, defendant pointed the BB gun

directly at another person's face at a distance of only six to eight inches, and a detective testified that based on his testing that the gun was capable of denting a quarter-inch piece of cedar plywood at distances up to two feet.

### 3. Kidnapping— second-degree—motion to dismiss—sufficiency of evidence—restraint

The trial court did not err by denying defendant's motion to dismiss the charges of second-degree kidnapping even though defendant alleges there was insufficient evidence of restraint separate and apart from that inherent in the robberies, because: (1) defendant restrained two store employees at gunpoint in order to coerce fellow employees to hand defendant the money, and such restraint was unnecessary to the armed robberies when defendant could have accomplished the robberies by directly approaching the other employees; (2) one of the restrained employees was actually outside the store when defendant approached him and forced him to move inside the store; and (3) the other restrained employee was occupied at the rear of the store, while another employee was in the store office at the computer register.

Appeal by defendant from judgments entered 28 February 2002 by Judge J. Richard Parker in Superior Court, Dare County. Heard in the Court of Appeals 8 June 2004.

*Attorney General Roy Cooper, by Assistant Attorney General Allison S. Corum, for the State.*

*Sue Genrich Berry for defendant appellant.*

WYNN, Judge.

Defendant William Conrad Hall appeals from judgments of the trial court entered upon jury verdicts finding him guilty of two counts of robbery with a dangerous weapon and two counts of second-degree kidnapping. Defendant contends the State presented insufficient evidence to convict him of these crimes, and the trial court therefore erred in denying his motions to dismiss the charges. For the reasons hereafter stated, we find no error by the trial court.

The evidence before the trial court tended to show that on the evening of 2 June 2002, Marvin McNeal Shultz and Kimberly Joan Voltz were working at "The Brew Thru," a "drive-through convenience store" located in Nags Head, North Carolina. Shultz was stocking sup-

plies in the refrigerated units at the rear of the store when he felt an object touch his back and he heard a voice say, "[G]ive me all your money or I will kill you." Shultz turned and saw a man wearing dark clothing and a dark ski mask. Shultz described the man as being Caucasian and approximately five feet, eleven inches in height, carrying a dark-colored pistol with a clip. Shultz raised his hands, and the man guided him with one hand on his shoulder and the gun at his back toward the store office approximately thirty feet away, where Voltz was inside counting money at the computer register. As they approached her, Shultz called her name, and Voltz turned to face them. The intruder told Voltz, "Give me all the money or I will shoot him." Voltz asked whether the man was serious, whereupon he pointed the gun at her face and said, "[D]on't get hurt over somebody else's money." Voltz testified the gun was approximately six to eight inches from her face. Voltz immediately turned back to the register and removed approximately $637.00 from the drawer, which the man instructed her to place directly in his hand. The robber departed, and Voltz and Shultz summoned law enforcement.

Voltz confirmed the robber was Caucasian, and that he spoke with a southern American accent. The gun was "a thin blackish gray" and appeared to be semi-automatic. Both Voltz and Shultz identified State's Exhibit 9, a handgun, and State's Exhibit 10, a ski mask, as being consistent with the gun and the ski mask used by the robber.

Rex Meads testified he spoke with Defendant shortly before midnight on the evening of 2 June 2002 at a bowling alley located directly across from "The Brew-Thru." Meads testified the convenience store was between four to six hundred yards from the bowling alley.

Robert Ferguson gave further testimony for the State. Ferguson testified he was working at "The Brew Thru" on the evening of 16 June 2002, when a man approached him from behind and placed against his back an object Ferguson assumed was a gun. Ferguson was loading supplies onto a cart from a shed located behind the store at the time. The man, who wore a dark ski mask and dark clothing, told Ferguson, "[J]ust take me to the money and you're not going to get hurt." The man then marched Ferguson approximately 128 feet to the convenience store entrance and inside to the store cash register, where store employee Alexandra Brindle was counting out the money contained in the cash drawer. Upon the demand of the robber, Brindle gave him approximately $2000.00 in mostly twenty dollar bills. After

ordering Ferguson and Brindle to lie on the floor, the man departed. Brindle described the robber as having reddish-brown facial hair, from what she could observe from the mouth opening in the ski mask. According to Brindle, the gun was "all black with like a semi-automatic pistol." Brindle identified State's Exhibit 9, the handgun, and State's Exhibit 10, the ski mask, as being very similar to the ones used in the robbery.

Heather Scott testified she was a friend of Defendant's during the summer of 2002. Scott observed Defendant with a black BB gun during June of 2002, and identified State's Exhibit 9 as being consistent with the BB gun used by Defendant. On 17 June 2002, Defendant visited Scott at her residence with "a wad of money." Defendant told Scott he had given some money to Kimberly Stallings, his girlfriend. When Scott asked Defendant where he had gotten the money, he replied that he had "robbed a businessman."

Kimberly Stallings testified she dated Defendant during the summer of 2002, and that he occasionally stayed at her residence and drove her vehicle while he was looking for another place to live. Stallings identified State's Exhibit 9 as the BB gun Defendant kept at her house. On the evening of 2 June 2002, Stallings left her five-year-old son in Defendant's care while she went to work. Defendant, however, telephoned Elaine Hill, a close friend to Stallings who regularly cared for her son, and asked whether Stalling's son could stay with her for an hour. Defendant explained that "he had to go out and contact some people about getting some side jobs . . . . because he needed to get some money." Defendant did not return, however, after dropping Stalling's son off with Hill. Defendant called Hill between 10:45 and 11:30 p.m. and told her that "things had gone a little longer than he thought" and asked Hill to keep the boy overnight. Hill expressed concern to Stallings the next day over the fact that her son had been "kind of excited" because Defendant had his BB gun in the car.

On the evening of 16 June 2002, Stallings and her son dined at a restaurant with a friend and returned home at approximately 10:00 p.m. Stallings left her vehicle at home during this time. Defendant was at the residence when they arrived. After putting her son to bed, Stallings asked Defendant to drive to a store to purchase beer. When he returned from the store, Defendant gave Stallings one thousand dollars in twenty dollar bills. Stallings noticed that Defendant's fingernails were extremely dirty. Defendant explained that he had "dug the money up out of a drug dealer's yard."

**STATE v. HALL**

[165 N.C. App. 658 (2004)]

Stallings deposited the money Defendant gave her into her bank account the following day. When Stallings learned of the "Brew Thru" robbery through a pamphlet posted at the restaurant where she worked, Defendant immediately "popped in [her] mind." Stallings attempted to call the telephone number listed on the pamphlet, but gave up because she "never got through." On 18 June 2002, Defendant moved out of Stalling's residence at her request. Stallings stated she "had been trying for a while to get [Defendant] to find somewhere else to go." After he left, Stallings bought new locks for her doors. As she was having the locks installed, two detectives arrived and told her they were looking for Defendant. Stallings asked them whether their presence "had anything to do with the Brew Thru thing" and gave them permission to search her residence and her vehicle. The detectives found Defendant's BB gun and a ski mask which Stallings testified did not belong to her or her son. The detectives also found a dark blue jumpsuit belonging to Defendant in Stalling's vehicle. After he was arrested, Defendant called Stallings from jail and told her he was a drug dealer and had buried the money himself.

Detective Christopher Montgomery of the Nags Head Police Department testified that the weapon seized from Stalling's residence was a 177 caliber BB gun, and that it was functional based on tests he performed. Detective Montgomery explained that he had fired the gun into a piece of cedar plywood from distances of six, twelve and twenty-four inches, and that the BB pellet made a dent in the wood each time. The muzzle of the gun contained scratches consistent with a description of the weapon given to Detective Montgomery by Brindle. Detective Montgomery arrested Defendant on 18 June 2002. He stated that Defendant's appearance during trial was substantially the same as it was at the time of his arrest, and noted that Defendant wore a goatee and moustache.

Defendant presented evidence by Stallings, who testified that when she saw Defendant at her residence on 18 June 2002, his eye was bruised and red in one corner, he had a cut above one eye, and it appeared to her that he had been hit with something.

At the close of the evidence, the trial court denied Defendant's motion to dismiss the charges, and the jury returned verdicts finding Defendant guilty of two counts of robbery with a dangerous weapon and two counts of second-degree kidnapping. The trial court consolidated for judgment one count of robbery with a dangerous weapon and one count of second-degree kidnapping and sentenced Defendant to a minimum of 103 months' imprisonment and a maximum of 133

months, followed by an identical consolidated sentence for the remaining two charges. Defendant appealed.

---

Defendant contends on appeal the trial court erred in denying his motion to dismiss, arguing the State presented insufficient evidence to show (1) he was the perpetrator of the offenses; (2) a dangerous weapon was used during the commission of the robberies; and (3) restraint separate from that inherent in the robberies such as to support the kidnapping charges. We find no error in the judgments of the trial court.

### Motion to Dismiss

In determining whether to grant or deny a defendant's motion to dismiss on the ground of sufficiency of the evidence, the trial court must decide "whether there is substantial evidence of each essential element of the offense charged and of the defendant being the perpetrator of the offense." *State v. Crawford*, 344 N.C. 65, 73, 472 S.E.2d 920, 925 (1996). Substantial evidence is such relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *State v. Barden*, 356 N.C. 316, 351, 572 S.E.2d 108, 131 (2002), *cert. denied*, 538 U.S. 1040, 155 L. Ed. 2d 1074 (2003). As to whether substantial evidence exists, the question for the trial court is not one of weight, but of the sufficiency of the evidence. *State v. Lucas*, 353 N.C. 568, 581, 548 S.E.2d 712, 721 (2001). In resolving this question, the trial court examines the evidence in the light most advantageous to the State, drawing all reasonable inferences from the evidence in favor of the State's case. *State v. Hyatt*, 355 N.C. 642, 665, 566 S.E.2d 61, 76 (2002), *cert. denied*, 537 U.S. 1133, 154 L. Ed. 2d 823 (2003). Circumstantial evidence may withstand a motion to dismiss and support a conviction even when the evidence does not rule out every hypothesis of innocence. *Id.*

[1] Defendant contends the State presented insufficient evidence to show he committed the crimes charged in the instant case. Defendant directs this Court to conflicting testimony by victims of the armed robberies, one of whom described the robber as having brown eyes, while the second stated the robber had green eyes, but later gave a written statement listing the robber's eye color as blue. Defendant has green eyes. Defendant argues that eye color was "the only defining description of the perpetrator" and that the remaining circumstantial evidence was "subject to innocent explanation" and could not support Defendant's convictions. We do not agree.

The witnesses to both armed robberies consistently described the robber as being Caucasian, slightly under six feet tall, wearing dark clothing and carrying a handgun matching the one belonging to Defendant. The robber wore a ski mask identical to the one seized at Stalling's residence. One of the witnesses described the robber as having "reddish-brown facial hair." Detective Montgomery described Defendant as having a goatee and moustache. The two robberies were strikingly similar to one another, both of which were committed at the same location on a Sunday night during the store's closing shift within two weeks of each other. The robber wore dark clothing and a ski mask each time, carried the same type of weapon, and utilized the same robbery method during each robbery. Brindle testified the robber took over two thousand dollars during the 16 June robbery, mostly in twenty dollar bills. That same night, Defendant gave Stallings one thousand dollars in twenty dollar bills. Defendant offered different explanations for the source of the cash. He first told Stallings he dug the money up out of a drug dealer's yard. He later told her he was a drug dealer and had buried the money himself. Defendant told Scott he had obtained the money by "robbing a businessman." On the evening of 2 June 2002, the night of the first robbery, Defendant never returned to Hill's residence to pick up Stalling's son, although he told Hill he would only be gone for an hour. On the evening of 16 June 2002, the night of the second robbery, Defendant had access to Stalling's vehicle and gave her one thousand dollars upon his return from the store. Defendant was observed at a bowling alley located directly across from the convenience store several hours after the 2 June robbery. Detectives seized a BB gun and dark blue jumpsuit belonging to Defendant, both of which were consistent with descriptions by witnesses of the gun and clothing used by the robber. Defendant offered no evidence or "innocent explanation" for his actions at trial. When viewed in the light most favorable to the State, the evidence, taken as a whole, was sufficient to support the jury's finding that Defendant was the perpetrator of the crimes charged against him. We therefore overrule Defendant's assignment of error in this regard.

*Dangerous Weapon*

[2] By his second assignment of error, Defendant contends the BB gun used in the robberies cannot be considered a dangerous weapon. Section 14-87(a) of the North Carolina General Statutes provides that

Any person or persons who, having in possession or with the use or threatened use of any firearms or other dangerous weapon, implement or means, whereby the life of a person is endangered or threatened, unlawfully takes or attempts to take personal property from another or from any place of business, residence or banking institution or any other place where there is a person or persons in attendance, at any time, either day or night, or who aids or abets any such person or persons in the commission of such crime, shall be guilty of a Class D felony.

N.C. Gen. Stat. § 14-87(a) (2003). The determinative question in reviewing whether a weapon may be considered dangerous under this statute, "is whether the evidence was sufficient to support a jury finding that a person's *life* was in fact endangered or threatened." *State v. Alston*, 305 N.C. 647, 650, 290 S.E.2d 614, 616 (1982). Where "all the evidence shows the instrument could not have been a firearm or other dangerous weapon capable of threatening or endangering the life of the victim, the armed robbery charge should not be submitted to the jury." *State v. Allen*, 317 N.C. 119, 124-25, 343 S.E.2d 893, 897 (1986); *see also State v. Joyner*, 295 N.C. 55, 243 S.E.2d 367 (1978). In *Joyner*, our Supreme Court found a soda bottle to be a sufficiently deadly weapon for a jury to consider a charge of assault with a deadly weapon and noted that "where the instrument, according to the manner of its use or the part of the body at which the blow is aimed, may or may not be likely to produce such results, its allegedly deadly character is one of fact to be determined by the jury." *Id.* at 64-65, 243 S.E.2d at 373.

In *State v. Westall*, 116 N.C. App. 534, 449 S.E.2d 24, *disc. review denied*, 338 N.C. 671, 453 S.E.2d 185 (1994), the defendant committed armed robbery by placing a pellet gun into the convenience store clerk's back, pointed directly at her kidney. The State presented evidence showing "the projectile from such a pistol was capable of totally penetrating a quarter-inch of plywood." This Court concluded that, "[f]rom the manner in which the pellet gun was used, there was clearly sufficient evidence to permit the jury to decide whether defendant committed robbery with a dangerous weapon or the lesser included offense of common law robbery." *Id.* at 540-41, 449 S.E.2d at 28.

Here, the evidence tended to show that Defendant committed the robberies by placing a BB gun directly into the backs of the store clerks, Shultz and Ferguson. Further, Voltz testified Defendant

pointed the BB gun directly at her face at a distance of only six to eight inches. Detective Montgomery stated that, based on the testing he performed on the gun, it was capable of denting a quarter-inch piece of cedar plywood at distances up to two feet. From this evidence, the jury could conclude that Defendant's weapon was capable of endangering the lives of the victims had it been discharged. This assignment of error is overruled.

### Kidnapping

[3] Finally, Defendant argues his convictions for second-degree kidnapping must be vacated because the State presented insufficient evidence of restraint separate from that inherent in the robberies. We reject this assignment of error.

Under section 14-39(a) of the North Carolina General Statutes, a person is guilty of kidnapping if he or she

> unlawfully confine[s], restrain[s], or remove[s] from one place to another, any other person 16 years of age or over without the consent of such person . . . if such confinement, restraint or removal is for the purpose of . . . [f]acilitating the commission of any felony or facilitating flight of any person following the commission of a felony . . . .

N.C. Gen. Stat. § 14-39(a) (2003). It is well established that any restraint which is an inherent, inevitable feature of another felony, such as armed robbery, cannot form the basis of a kidnapping conviction. *State v. Beatty*, 347 N.C. 555, 558, 495 S.E.2d 367, 369 (1998). "The key question . . . is whether the kidnapping charge is supported by evidence from which a jury could reasonably find that the necessary restraint for kidnapping 'exposed [the victim] to greater danger than that inherent in the armed robbery itself . . . .' " *State v. Pigott*, 331 N.C. 199, 210, 415 S.E.2d 555, 561 (1992) (quoting *State v. Irwin*, 304 N.C. 93, 103, 282 S.E.2d 439, 446 (1981)).

Defendant contends there was insufficient evidence to show restraint separate and apart from that restraint necessary to accomplish the armed robbery. This argument has no merit. The evidence tended to show Defendant restrained the store employees Shultz and Ferguson at gunpoint in order to coerce fellow employees Voltz and Brindle to hand him the money. Such restraint was unnecessary to the armed robberies, however. Defendant could have accomplished the robberies by directly approaching Voltz and Brindle. Indeed, the

evidence showed that Ferguson was actually outside the store when Defendant approached him and forced him to move inside the store. Similarly, Shultz was occupied at the rear of the store, while Voltz was in the store office at the computer register. Because these actions were separate and apart from the actual armed robberies, the trial court properly submitted the kidnapping charges to the jury.

In the judgments of the trial court, we find,

No error.

Judges CALABRIA and LEVINSON concur.