An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-904

Filed 6 May 2026

Wake County, Nos. 21CR201071-910; 21CR201077-910; 21CR201078-910; 21CR201079-910; 21CR201081-910; 21CR201082-910; 21CR203408-910; 21CR203411-910; 21CR203421-910

STATE OF NORTH CAROLINA

v.

HENDERSON JONES ATWATER

Appeal by defendant from judgment entered 31 July 2024 by Judge Keith O. Gregory in Wake County Superior Court. Heard in the Court of Appeals 26 March 2026.

*Attorney General Jeff Jackson, by Special Deputy Attorney General Terence Steed, for the State.*

*W. Michael Spivey for defendant-appellant.*

ARROWOOD, Judge.

Henderson Atwater ("defendant") appeals from judgment entered 31 July 2024 upon his conviction of seven counts of discharging a barreled weapon into an occupied vehicle, five counts of injury to personal property, three counts of injury to real property, and one count of assault with a deadly weapon. For the following reasons,

we discern no error and affirm defendant's convictions.

## I.     Background

On 8 January 2024, defendant was arraigned and pled not guilty to forty-three indictments. On 10 July 2024, the State filed a motion to join thirteen of the forty-three indictments for trial. The trial court granted the State's motion on 24 July 2024.

The thirteen indictments arose from thirteen incidents of vehicles, buildings, or people being shot at with a BB or pellet gun. The incidents took place between March and December 2020 and largely occurred in three close locations around Holly Springs, North Carolina: on Piney Grove Wilbon Road, on Main Street, and near Holly Springs Elementary School. Below, we describe the thirteen incidents as presented through trial testimony and the investigation that led to the charges.

### A.     Shooting Incidents

On 8 March 2020, James Mauldin was driving toward Bass Lake on Piney Grove Wilbon Road. As another car slowly passed by him, Mauldin heard a loud pop that sounded like a gunshot in his driver's door. Mauldin described the car that passed him as a silver four-door "Honda Civic-type car" and said it was being driven by an African American man. Mauldin pulled over and saw two dents resembling bullet holes that went "almost all the way through" in the driver's door of his truck. He told a deputy sheriff that he believed his truck was shot with a pellet gun or a .22 but no pellets or projectiles were found.

On 14 April 2020, Dwight Brown heard a loud crash while working at his company Pace Yourself Running Company ("Pace") which is located in a strip of shops facing Main Street. Brown and his business partners inspected the store to find the source of the noise and noticed that a window in the front of the store had been damaged. Brown saw similar damage at Sir Walter Coffee, a shop located in the same strip as Pace. He did not notice any debris or projectiles by the windows. The following day, an officer responded to a report about the incident and noticed similar damage to the windows of two other businesses.

On 19 April 2020, Meghan Griffin's car was damaged while she was driving on Main Street. Initially, Griffin thought she had heard a rock hit her car windshield. However, when she looked at her driver's side door, she saw what "looked like a gunshot or a BB or something in it." Griffin did not see what caused the damage and did not describe any person or vehicle who may have been responsible. No projectiles were found in her car. On the same day, Julia Emore was driving home from Bass Lake with her friend. When she was near Holly Springs Elementary, her friend heard "a weird sound" and noticed her back driver's side window was "shot out." Emore did not see any projectiles or any car or person nearby when her window was damaged.

On 20 April 2020, Jeremy Hammons was traveling south on Piney Grove Wilbon Road. He met a car traveling north that braked "very hard" as he approached. Hammons described the car as small, gray, and dark-in-color. He reported that the driver was wearing a white T-shirt, but he could not tell if the driver was male or

female. As he passed the car, Hammons heard a loud noise that he thought was from his tire throwing up a rock. That day, Hammons did not notice any damage to his car. However, the next day, Hammons' wife drove the car and noticed dents on the rear driver's side door, about an inch below the window.

On the evening of 16 May 2020, Meghan Rowe was a passenger in a car driven by her husband on Piney Grove Wilbon Road. She heard glass shattering and turned to see that the rear window on the driver's side of their car had been shot out. Around two days after the incident, Rowe reported the incident to the Wake County Sheriff's Department who conducted a phone interview. Rowe reported to the police that she saw a "tan or light-colored Dodge Durango" driving nearby when the window broke. At trial, she testified that there were two or three cars coming towards them at the time, but she could not remember what the other cars looked like.

Arianna Evans was also traveling on Piney Grove Wilbon Road that same evening. She heard a "pop" and her front driver's side window shattered. She pulled over and discovered she was bleeding from above her left eyebrow. Evans reported that three cars passed her when her window shattered, with the last one being a light color, gold or white, BMW or Saab. Soon after the incident, Evans sought medical treatment to remove "some sort of pellet" from her forehead.

On 7 June 2020, Jennifer French was a passenger in a car driven by her son on Holly Springs Road near Holly Springs Elementary School when she heard "two loud tings" that sounded like "metal on metal." She did not know what the sound

was. When French arrived home, she found two dents on the passenger side of the car but no projectiles that may have caused the damage. French testified that she was sure there were other cars on the road when she heard the loud noises but could not identify any specific vehicles.

On 9 June 2020, Jennifer Putzi was driving her black Jeep down Main Street when she "heard a pop sound" and something hit the rear driver's side of the car. She could not tell what the sound was, but when she pulled over, she noticed a hole in the rear window of her Jeep. Putzi did not find any bullet or projectile in her car and did not describe any vehicles, people, or weapons that may have been involved.

In September 2020, Edward Barys reported damage to his house. Wake County Deputy Sheriff Berryman went to Barys' home to investigate the report and confirmed damage to the vinyl siding and a dent in the garage door. Deputy Berryman saw the back of a pellet lodged in the siding. Video obtained from Barys' doorbell camera showed that a vehicle pulled up to the house on 25 September 2020 at 9:30 a.m., a shot was heard, and then the vehicle sped away.

On 10 December 2020, Irena Krstanovic was driving on Holly Springs Road and heard the sound of a gunshot as she passed Holly Springs Elementary School. She turned and saw a male pedestrian walking on the sidewalk by her car. She pulled over and saw that a shot had hit her back window. While Krstanovic was stopped, the pedestrian approached her. He said he heard a gunshot but did not see what happened. He looked in the back of her car and found "a little bullet" which he said

was from a pellet gun. Krstanovic testified that there were no vehicles coming towards her when she heard the gunshot.

In the early morning of 17 December 2020, Catherine Smith approached an intersection on Piney Grove Wilbon Road on her way to Garner, North Carolina. She heard a "large thump or a thud" on the driver's side of her vehicle. When she heard the noise, a small sedan was traveling towards her in the opposite direction. Smith did not know what the noise was and continued driving to a well-lit parking area. She pulled into a parking lot and saw what appeared to be a bullet or something similar on the rear driver's side door of her car.

### B.     Packer

Between the aforementioned incidents, Craig Packer reported an incident between him and defendant. In June or July of 2020, Packer and his wife began visiting their new property in Holly Springs. They had secured a loan to build a home on the open lot and Packer was consistently on the property during construction. He noticed that many members of the community would use the powerline easement on his property to drive ATVs and trucks, shoot guns, and dump garbage. Packer got into many arguments with people who thought that the easement was public access.

Packer met defendant around August or September 2020 when defendant was parked in a car on the easement listening to music. Packer informed defendant that the easement was private property. Defendant told Packer that he owned the property across the road. The two of them spoke on about five different occasions in

a friendly manner. Packer would frequently see defendant across the road mowing grass, walking around, or sitting in his car listening to music. On at least one occasion, Packer saw defendant repeatedly firing a pellet rifle. Packer also saw other people going to the property, parking there, and sometimes dumping garbage. Packer suspected that no one lived on the property because the house was dilapidated.

On 19 September 2020, Packer and his wife were on their property cutting down trees and brush. Defendant was across the street doing yard work. Later, Packer heard a "choo" and the sound of a projectile whizzing through the leaves. From his own experience with small BB guns and pellet guns, Packer recognized the sound as the burst of $CO_2$ from a weapon. He looked up and saw defendant driving by with the barrel of a gun through the window. Packer went to pursue defendant in his truck but decided against it as he was unlikely to catch up.

Soon after, defendant returned and Packer followed him until defendant stopped and got out of his car. Packer and defendant had a heated confrontation in which defendant denied shooting at Packer. Defendant said that someone was hiding in the woods and shooting at defendant all day while he was mowing grass, and that it was probably that person who shot at Packer. However, Packer testified that he had not seen anyone else or heard any other shots that day. Packer took a picture of defendant's car and license plate which bore the number TAS-9711. He then called 911 and reported the incident to the sheriff's department.

C.    Investigation and Trial

- 7 -

The Wake County Sheriff's Department and the Holly Springs Police conducted investigations into these separate incidents that led them to believe they were each committed by defendant. On 15 April 2020, Holly Springs Police Officer Matthew Watson went to Pace to investigate the damage to it and the surrounding businesses. From the point of impact in Pace's window, Officer Watson believed that whatever hit the glass was small, "wasn't travelling very fast," and came from the direction of Main Street. A Pace employee told Officer Watson that the window was damaged at around 4:40 p.m. Officer Watson viewed the surveillance video and determined when the window was hit based on when someone in the store turned around to look at the window. He testified that the window was hit at 16:41:31 military time with a deviation of around two seconds.

Officer Watson testified that the video showed a "dark-in-color passenger car driving past the business" at the time something hit the window. However, he could not identify the make, model, or any other distinctive feature of the car. Officer Watson knew that another business further down Main Street, ASAP Computers ("ASAP") had video surveillance cameras. He estimated the time when the vehicle he observed in the Pace video would pass ASAP based on its speed and the distance between the businesses. Officer Watson testified that the ASAP video system was forty-two minutes fast and so he retrieved video for 14 April 2020 at 17:23 which would capture events around "4:40, 4:41" p.m.

Officer Watson recorded the ASAP video with his phone and gave the recording

to Holly Springs Investigator Melissa Ottaway. Investigator Ottaway viewed the video and took a screenshot of a vehicle shown in the video in the farthest lane from the camera at 3 minutes and 41 seconds. She used the screenshot to create and distribute a "Be on the Lookout flyer." Then, Holly Springs Detective Matt Hilkert used the video and screenshot to attempt to locate the vehicle when it passed traffic cameras at 5:22 p.m. Detective Hilkert observed a gray Dodge Durango, a gray Toyota Camry, and a Volkswagen pass the camera. Investigator Ottaway viewed the video of the Volkswagen and saw that it had license plate number TAS-9711 which was registered to defendant and Adele Dickson. She contacted Dickson and asked her to schedule a time to meet, but neither Investigator Ottaway nor Dickson followed up.

Investigator Ottaway also investigated the incidents involving Putzi and Krstanovic. She located and viewed surveillance video of Main Street around the time that Putzi's car was shot. The video showed defendant's Volkswagen with the plate TAS-9711 passing Putzi's car. When investigating the incident involving Krstanovic, Investigator Ottaway went to the area near Holly Springs Elementary School where the shooting allegedly occurred. She noticed a single-family residence with a tall wooden privacy fence that had one missing board facing the elementary school. Investigator Ottaway testified that the missing board was significant because there were multiple reports of shootings in that area and it seemed like a place where someone could stand and shoot a pellet or a BB gun. It was later discovered that

- 9 -

defendant's father, Amon Atwater, lived in the house.

Meanwhile, in May 2020, Wake County Sheriff's Investigator Richard Whitlow was assigned to investigate the incident involving Evans, who was struck in the forehead with a pellet. During his investigation, Investigator Whitlow learned of the pellet gun shootings which had damaged property in Holly Springs. Investigator Whitlow recognized a common pattern in the shooting: "A subject firing at moving vehicles with a rifle or pellet gun . . . as well as driving though Main Street and shooting out windows on a storefront[.]" Additionally, Investigator Whitlow recognized that the Holly Springs incidents and the incidents on Piney Grove Wilbon Road were in the same area since Piney Grove Wilbon Road was a straight drive from Main Street in Holly Springs.

Investigator Whitlow then connected many of the incidents to defendant's cars or locations that he frequented. Investigator Whitlow's investigation confirmed that defendant owned and had access to the 2017 Volkswagen Jetta believed to be present at the Pace, Putzi, and Packer shootings. Additionally, defendant owned an older Toyota Corolla that was dark in color, and reports from incidents early in 2020 indicated that a dark color Toyota or Honda style sedan was travelling near the vehicles that had been struck. As for the location of the incidents, Investigator Whitlow spoke to Packer at his home and learned that defendant frequented the property across the street, which was actually owned by defendant's father. Investigator Whitlow also realized that both defendant and Barys had addresses on

Mims Road which was close to Piney Grove Wilbon Road.

In January 2021, Investigator Whitlow went to defendant's home to speak to him and saw what appeared to be a rifle in plain view in the back of defendant's Volkswagen. Later that month, Investigator Whitlow obtained a search warrant and searched defendant's home and Volkswagen. During the search outside defendant's residence, officers found numerous spent $CO_2$ cartridges and pellets which Investigator Whitlow testified were used in a pellet rifle. Officers also found a truck and a flat screen television that appeared to have been shot with a pellet or BB gun as target practice.

Inside the house, officers found more used $CO_2$ cartridges, loose and contained pellets and BBs, and two pellet guns. The first gun was a pellet pistol with a $CO_2$ cartridge and a pellet magazine attached. The second gun was a disassembled rifle in defendant's bedroom. The officers placed that rifle in a box labelled "Ruger Impact Max[,]" although Investigator Whitlow also refers to that rifle as a "Ruger Impact Max Elite" or "Max Elite" in his testimony. The box listed the muzzle velocity of the rifle as 1,050 feet per second.

Officers also recovered a Ruger Impact Max Elite pellet rifle from defendant's Volkswagen, which Investigator Whitlow placed in its original box. Investigator Whitlow testified that the rifle in defendant's Volkswagen was "very similar" to the rifle in his bedroom, but they had different names according to the packaging. Investigator Whitlow also testified that he was not familiar with these models of

weapons outside of this case. However, he did figure out how to load the rifle. Investigator Whitlow testified that it was a single shot rifle and to discharge it, one had "to break the action where the barrel points down, put the bullets or BB, pellet in it, close the action, and then fire." Breaking the action essentially requires "fold[ing] the rifle in half."

Lastly, officers recovered a box for a full-auto air gun. During his testimony, Investigator Whitlow read the warnings on the box that indicated that the gun had a muzzle velocity of 465 feet per second and could cause "fatal injury." The air gun that belonged in the box was never recovered.

At trial, the State presented, among other evidence, testimony from victims and investigators demonstrating the above-mentioned facts. Defendant did not present any evidence and moved to dismiss the charges at the close of the State's evidence. The trial court denied his motion. The jury found defendant guilty of seven counts of discharging a barreled weapon into an occupied vehicle, five counts of injury to personal property, three counts of injury to real property, and one count of assault with a deadly weapon. Defendant was found not guilty of the charges that arose from the incidents with Meghan Rowe, Arianna Evans, Catherine Smith, and Edward Barys. The trial judge sentenced defendant to a cumulative sentence of imprisonment for a minimum of 588 months and a maximum of 791 months.

## II.     Discussion

Defendant argues that the trial court erred by denying his motion to dismiss

the charges of discharging a barreled weapon into an occupied vehicle and assault with a deadly weapon. For the following reasons, we hold that the trial court did not err in denying defendant's motion to dismiss.

## A.    Standard of Review

"This Court reviews the trial court's denial of a motion to dismiss *de novo*." *State v. Smith*, 186 N.C. App. 57, 62 (2007) (citations omitted). "Upon defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied." *State v. Fritsch*, 351 N.C. 373, 378 (2000) (quoting *State v. Powell*, 299 N.C. 95, 98 (1980)). Substantial evidence exists if there "is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith*, 300 N.C. 71, 78 (1980) (citations omitted). "In making its determination, the trial court must consider all evidence admitted, whether competent or incompetent, in the light most favorable to the State, giving the State the benefit of every reasonable inference and resolving any contradictions in its favor." *State v. Rose*, 339 N.C. 172, 192–93 (1994) (citations omitted).

"Once the court decides that a reasonable inference of defendant's guilt may be drawn from the circumstances, then it is for the jury to decide whether the facts, taken singly or in combination, satisfy it beyond a reasonable doubt that the defendant is actually guilty." *State v. Blagg*, 377 N.C. 482, 489 (2021) (quoting *State*

*v. Fritsch*, 351 N.C. 373, 379 (2000)). "Contradictions and discrepancies are for the jury to resolve and do not warrant dismissal." *State v. Coley*, 257 N.C. App. 780, 786 (2018). "In borderline or close cases, our courts have consistently expressed a preference for submitting issues to the jury." *Blagg*, 377 N.C. at 489 (citations omitted).

### B.    Discharging A Barreled Weapon

Defendant contends that the State presented insufficient evidence that 1) a weapon with a muzzle velocity of 600 feet per second was used in any of the cases of discharging a barreled weapon into an occupied vehicle; 2) that French's vehicle was shot at all; and 3) that defendant was the perpetrator of the offenses charged. We address each of defendant's arguments separately.

### 1.    Muzzle Velocity

To support a conviction of discharging a barreled weapon into an occupied vehicle, the State must show in part that the weapon was "capable of discharging shot, bullets, pellets, or other missiles at a muzzle velocity of at least 600 feet per second[.]" N.C.G.S. § 14-34.1(a) (2025); *see also State v. Small*, 201 N.C. App. 331, 341–42 (2009). Defendant argues that the State presented insufficient evidence of the muzzle velocity of the weapon used because there were no descriptions from the victims or video evidence of what the weapon used looked like. Additionally, defendant contends that the single-shot Ruger Rifle could not have been used in the incidents involving Mauldin, Hammons, and French where multiple shots were

discharged from a moving vehicle because the rifle would have taken too long to reload between shots.

However, when considered in the light most favorable to the State and drawing all reasonable inferences in favor of the State, there was substantial evidence to submit to the jury that a barreled weapon with a muzzle velocity of at least 600 feet per second was used in each incident. The State presented evidence that defendant possessed at least one pellet rifle with a muzzle velocity of well over 600 feet per second, as well as another similar rifle which was found in his car. Additionally, the weapon used in each shooting caused significant damage such as shattered windows and dents in the car doors, suggesting the use of a powerful weapon consistent with a higher muzzle velocity.

As to the incidents where multiple shots were discharged, evidence suggested that the rifle had to be reloaded between shots, making it more difficult to use that rifle to shoot a target multiple times from a moving vehicle. However, the State presented other evidence from which the jury could infer that defendant could fire his pellet rifle quickly. Namely, Packer testified that he had seen defendant repeatedly fire a pellet rifle. Additionally, the large amount of ammo and targets found at defendant's home suggests he is well-experienced with BB and pellet guns. Further, Mauldin testified that both he and the car passing him were driving slowly while Hammons testified that the car he passed at the time of the shooting had slammed on its brakes.

Viewing the evidence in the light most favorable to the State, defendant's experience plus the slow speed of the cars in some incidents suggests it is possible that the single-shot Ruger Rifle or a similar rifle was used in the shootings. Any contradiction or discrepancies in the evidence was for the jury to resolve. Altogether, the State's evidence was sufficient to survive a motion to dismiss.

## 2.    French

Defendant also argues that there was insufficient evidence that French's car was shot by anyone and emphasizes that there was no description or photo of the dents presented to the jury, no projectiles found, and no person or vehicle nearby that they associated with the sound that the State alleges came from the shooting. However, particularly considering the similarities between the incident described by French and the other shootings, we find that the State presented substantial evidence that French's car had been shot.

French described the sound she heard as "metal on metal" which is consistent with a pellet or BB hitting her car. The damage to her car was similar to Mauldin and Hammons, who also found dents in their car doors but no projectile. Additionally, just as in the incidents with Krstanovic and Emore, French was driving near Holly Springs Elementary School in the afternoon when she heard the sound. The fact that French did not see anyone that may have shot at her car is similar to Krstanovic and consistent with the State's theory that defendant was shooting through the missing fence panel on his father's property. Given the similarities between what French

described and the other shooting incidents, there was such relevant evidence as a reasonable mind might accept as adequate to support a conclusion that French's car was shot. Accordingly, the trial court did not err by denying defendant's motion to dismiss.

### 3. Evidence that Defendant Was the Perpetrator

Defendant next argues that there was insufficient evidence that he was the perpetrator of the offenses charged. Defendant cites *State v. Bell* to support his argument that evidence of motive or opportunity alone is never sufficient to carry a case to the jury. Defendant claims that the State did not offer evidence of motive and instead merely invited the jury to speculate that defendant was "bored" and was shooting passing cars and businesses for fun. Additionally, defendant contends that the State did not prove opportunity because no eyewitnesses testified that they saw defendant discharging a weapon into their vehicle. Finally, defendant argues that the incidents charged were not sufficiently similar to indicate that they were committed by the same person. Defendant emphasizes that the incident with Packer was distinct from the shootings at random cars, that the descriptions of nearby cars at the time of the shootings were inconsistent, and that anyone with access to a BB or pellet gun could have committed the offenses.

Our courts have recognized "proof of motive, opportunity, capability and identity" as "different ways to show that a particular person committed a particular crime." *State v. Bell*, 65 N.C. App. 234, 238 (1983). Defendant correctly notes that in

*Bell*, this Court held that "evidence of *either* motive or opportunity alone is insufficient to carry a case to the jury." *Id.* at 238–39 (emphasis in original) (citations omitted). This Court also held that it was impossible "to glean from the existing cases any clear, bright-line test by which it can be accurately and consistently determined when the state has presented sufficient substantial circumstantial evidence of identity of the perpetrator to survive a defendant's motion to dismiss." *Id.* at 239–40. Rather, the issue of whether the State has presented substantial evidence that defendant committed the crime must be reviewed "in the light of all the circumstances." *Id.* at 240–41.

In *State v. Gallion*, this Court held that proof of both opportunity and capability was sufficient to survive the defendant's motion to dismiss his first-degree murder charge. 282 N.C. App. 305, 337–38 (2022). Proof of opportunity requires evidence placing the defendant at the scene of the crime at the time it was committed. *Id.* at 337. In *Gallion*, the State's evidence showed that the defendant was in the vicinity of the victim's home on the same day that they were last seen alive and at a time when a reasonable jury could find that the crime was committed. *Id.* at 337–38. As to the defendant's capability, the State showed that the casings found around the victim's body matched the ammunition found in the defendant's truck shortly after the defendant was in the vicinity of the victim's home, and that the defendant possessed multiple guns, one of which was later determined to be the murder weapon. *Id.* at 338.

Proof of identity through evidence of similar offenses can also demonstrate that a defendant was the perpetrator of the offense charged. "In many ways the problem of determining when 'substantial' evidence of identity has been presented is similar to the problem of determining whether evidence is relevant and therefore admissible." *Bell*, 65 N.C. App. at 240. Accordingly, we find the rules governing the relevancy of evidence that a defendant committed a similar offense to be instructive in determining what evidence may be considered in assessing whether the State presented sufficient evidence of the perpetrator's identity.

When proving identity through the similarities of offenses, " 'there must be shown some unusual facts present in both crimes or particularly similar acts which would indicate that the same person committed both crimes.' " *State v. Corum*, 176 N.C. App. 150, 156–57 (2006) (quoting *State v. Moore*, 309 N.C. 102, 106 (1983)). "Although it is not necessary that there be bizarre and unique signature elements common to the [offenses], the similarities between the crimes must support the reasonable inference that the same person committed both the earlier and the later crimes." *State v. Adams*, 220 N.C. App. 319, 328 (2012) (quoting *State v. Haskins*, 104 N.C. App. 675, 681 (1991)).

Remoteness of the crimes is also a factor. *Id.*; *see also Corum*, 176 N.C. App. at 156–57. For example, in *Corum*, evidence of a defendant's alleged robbery was admissible to prove his identity as the perpetrator of another robbery where both offenses occurred at convenience stores in neighboring counties at night within a two-

day period and the perpetrator of both robberies wore gloves and a blue hood or mask of similar descriptions. *Corum*, 176 N.C. App. at 157.

Here, the State presented substantial evidence that defendant was the perpetrator of each incident through a combination of proof of opportunity, capability, and identity. The State's evidence showed opportunity by placing defendant at the incidents involving Packer, Pace, and Putzi through eyewitness testimony or video of his car. Additionally, in the incidents involving Mauldin and Hammons, a car with a description consistent with either defendant's Volkswagen or his Toyota was present at the scene. The State also showed that defendant had the capability to commit each offense through evidence that defendant owned ammo and multiple BB or pellet guns and had experience using them. The combination of proof of opportunity and capability provides substantial evidence that defendant was the perpetrator of the offenses related to the incidents involving Packer, Pace, Putzi, Mauldin, and Hammons.

For the incidents where defendant or his car were not placed at the scene, the State provided substantial evidence that defendant was the perpetrator through the similarity of the incidents. Each of the incidents involved BB or pellet guns being shot at or from moving vehicles. All of the incidents occurred near each other and many of the incidents occurred repeatedly at the same precise locations such as in front of Holly Springs Elementary School. The thirteen incidents occurred over a span of ten months, and many incidents happened within days or weeks of another.

These similarities between incidents support the reasonable inference that they were all committed by the same person. Combined with the evidence that the incidents occurred in areas near defendant, one of which he had unique access to through the missing fence panel on his father's property, the evidence of defendant's capability, and the evidence of defendant's opportunity to commit some of the offenses, the State provided substantial evidence that defendant was the perpetrator of the offenses charged. Accordingly, the trial court did not err by denying defendant's motion to dismiss for insufficient evidence that he committed the offenses charged.

### C.  Assault with a Deadly Weapon

Finally, defendant contends that the trial court erred by denying his motion to dismiss the assault with a deadly weapon charge for the incident involving Packer because there was insufficient evidence that a deadly weapon was employed. Defendant argues that BB and pellet guns are not dangerous or deadly as a matter of law and as such the record must contain evidence that the nature of the gun and its manner of use was deadly. Defendant alleges that the record is devoid of any such evidence because Packer could only identify the weapon as a pneumatic weapon or pellet rifle.

Use of a deadly weapon is an essential element of assault with a deadly weapon. *In re Murdock*, 222 N.C. App. 45, 50–51 (2012) (citing N.C.G.S. § 14-33(c)(1)). Thus, to survive a motion to dismiss, the State must present substantial evidence that a deadly weapon was used in the assault. *See Fritsch*, 351 N.C. at 378.

A deadly weapon is "[a]ny instrument which is likely to produce death or great bodily harm, under the circumstances of its use." *State v. Batchelor*, 167 N.C. App. 797, 800 (2005) (quoting *State v. Smith*, 187 N.C. 469, 470 (1924)); *see also State v. Webster*, 291 N.C. App. 392, 397 (2023).

"The deadly character of the weapon depends sometimes more upon the manner of its use, and the condition of the person assaulted, than upon the intrinsic character of the weapon itself." *Batchelor*, 167 N.C. App. at 800 (quoting *Smith*, 187 N.C. at 470). For example, hands have repeatedly been held to be deadly weapons in cases where the defendant was significantly larger than the victim and used their hands to inflict serious injury. *See State v. Allen*, 193 N.C. App. 375, 378–79 (2008) (holding that the defendant's hands were deadly weapons and providing examples of similar cases). "Where the alleged deadly weapon and the manner of its use are of such character as to admit of but one conclusion, the question as to whether or not it is deadly . . . is one of law[.]" *Batchelor*, 167 N.C. App. at 800 (quoting *Smith*, 187 N.C. at 470). However, where a weapon "may or may not be likely to produce fatal results, according to the manner of its use . . . its alleged deadly character is one of fact to be determined by the jury." *Id.* (quoting *Smith*, 187 N.C. at 470).

In *State v. Pettiford*, 60 N.C. App. 92, 99 (1982), this Court held that a pellet rifle could be a deadly weapon. There, the defendant shot the victim at close range with a weapon, leaving a small entry wound with a large bruise and a metallic fragment from a bullet embedded in the victim's face. *Id.* at 93. The State presented

evidence tending to show that the defendant shot the victim with a small caliber pistol while the defendant presented evidence that he used a pellet gun. *Id.* at 93–94. In his appeal of his conviction of assault with a deadly weapon with intent to kill inflicting serious injury, defendant challenged the trial court's jury instructions which he claimed improperly instructed the jury that a pellet gun was a deadly weapon. *Id.* at 98. This Court held in part that it would not have been error for the trial court to instruct that the weapon defendant used was a deadly weapon as a matter of law because it was apparent from the victim's injuries that, under the circumstances it was used, the weapon was likely to cause death or great bodily harm. *Id.* at 99.

This Court has since emphasized that BB and pellet guns are not inherently dangerous or deadly as a matter of law but rather can be considered deadly based on their use. *See State v. Williamson*, 272 N.C. App. 204, 216 (2020) (explaining that *Pettiford* reinforces the principle that there must be evidence demonstrating the dangerous character of the weapon). In the context of determining whether the use of a BB or pellet gun can support a conviction of robbery with a dangerous weapon, this Court has held that "there must be evidence in the record of the weapons' capability to inflict death or serious bodily injury." *Id.* Adequate evidence of the dangerousness of the weapon may include demonstrations of its damage to targets at a relevant distance, descriptions of the weapon's capabilities, and warnings from the weapon's user manual. *See id.* at 214.

For example, in *State v. Hall*, 165 N.C. App. 658, 666 (2004), the State presented substantial evidence of a BB gun's deadly character by demonstrating its destructive power. There, during the commission of two robberies, the defendant had placed a BB gun directly into the backs of two store clerks and pointed the BB gun at the face of another clerk from a distance of only six to eight inches. *Id.* at 665–66. The State presented testimony from a detective that based on his testing, the BB gun allegedly used by the defendant "was capable of denting a quarter-inch piece of cedar plywood at distances up to two feet." *Id.* at 666. This Court held that the detective's testimony provided sufficient evidence for a jury to conclude that the defendant's BB gun "was capable of endangering the lives of the victims had it been discharged." *Id.*

Here, similar to *Hall*, the State provided substantial evidence of the deadly nature of defendant's weapon through evidence of damage to other physical objects. In several of the other shootings presented to the jury, the weapon employed caused dents in metal car doors or broke glass. In his testimony, Packer described where he was standing in relation to the road when he heard the shots and saw defendant drive past him. Combined with the detailed testimony describing the other incidents, Packer's testimony provides sufficient evidence for the jury to compare the damage and distance of the shootings and infer that defendant employed a deadly weapon.

Moreover, in addition to the evidence of actual damage caused in similar incidents, the State presented evidence of relevant characteristics of pneumatic weapons owned by defendant. The State demonstrated that two similar pellet rifles

were found in defendant's home and car and one of the rifles had a muzzle velocity of 1,050 feet per second. The State also presented to the jury the box for a full-auto air gun with a lower muzzle velocity of 465 feet per second that warned that the gun could cause fatal injury. This evidence provided further information from which the jury could reasonably infer that defendant used a weapon that, when shot from the road directly at someone in their yard, was likely to produce death or great bodily harm.

Defendant argues that the State's evidence is insufficient because here, there is little evidence of what weapon was actually used to shoot at Packer. Defendant asserts his case is distinguishable from *Hall*, wherein eyewitnesses and investigators testified that the gun belonging to the defendant and admitted as an exhibit at trial was consistent with or similar to the gun used in the robberies. *Hall*, 165 N.C. App. at 660–62.

While additional evidence of the precise gun used to shoot at Packer would certainly have strengthened the State's case, it is not necessary here in order to provide substantial evidence and send the question of the gun's deadly nature to the jury. The evidence that defendant owned several BB or pellet guns, each of which could be considered a deadly weapon given the manner of use, and that defendant had caused significant damage with BB or pellet guns in other similar incidents is sufficient to support a reasonable inference that defendant employed a deadly weapon when he shot a pneumatic weapon at Packer. Accordingly, the trial court did not err

by denying defendant's motion to dismiss.

### III.   Conclusion

For the foregoing reasons, we affirm defendant's convictions.

NO ERROR.

Judges GORE and MURRY concur.

Report per Rule 30(e).